> THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THE BANKRUPTCY COURT HAS APPROVED THIS DISCLOSURE STATEMENT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL, BUT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| CONGREGATION BIRCHOS YOSEF, | Case No. 15-22254 (RDD) |
| Debtor. | |

## DISCLOSURE STATEMENT FOR CREDITOR'S CHAPTER 11 PLAN OF REORGANIZATION FOR CONGREGATION BIRCHOS YOSEF, PROPOSED BY TD BANK, N.A.

**McCARTER & ENGLISH, LLP**
Joseph Lubertazzi, Jr.
Matthew Heimann
Four Gateway Center
100 Mulberry Street
Newark, New Jersey 07102
Telephone: (973) 622-4444
Facsimile: (973) 624-7070
Email: jlubertazzi@mccarter.com
Email: mheimann@mccarter.com

*Counsel to TD Bank, N.A., Plan Proponent*

Dated: Newark, New Jersey
       July 9, 2015

## DISCLAIMER

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF ADVISING CREDITORS OF THE CONTENT OF THE PLAN (DEFINED HEREIN) AND CERTAIN OTHER INFORMATION THAT IS MATERIAL TO THE CHAPTER 11 CASE AND THE PLAN. NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT REGARDING THE PLAN.

ALL CREDITORS SHOULD READ THIS DISCLOSURE STATEMENT AND ALL EXHIBITS HERETO, INCLUDING THE PLAN. THE PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND OTHER ORDERS OF THE BANKRUPTCY COURT. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED HEREIN. THE TRANSMISSION OF THIS DISCLOSURE STATEMENT SHALL CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION STATED SINCE THE DATE HEREOF. AFTER THE DATE HEREOF, THERE CAN BE NO ASSURANCE THAT (A) THE INFORMATION AND REPRESENTATIONS CONTAINED HEREIN WILL BE MATERIALLY ACCURATE AND (B) THIS DISCLOSURE STATEMENT CONTAINS ALL MATERIAL INFORMATION.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE, AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NONBANKRUPTCY LAW.

THIS DISCLOSURE STATEMENT WILL PROVIDE HOLDERS OF CLAIMS AGAINST THE DEBTOR WITH "ADEQUATE INFORMATION" (AS DEFINED IN THE BANKRUPTCY CODE) SO THAT THEY CAN MAKE AN INFORMED JUDGMENT ABOUT THE PLAN. ADDITIONAL DISCLAIMERS, REPRESENTATIONS AND LIMITATIONS BY THE PROPONENT REGARDING THE SOURCES OF THE INFORMATION PROVIDED HEREIN ARE INCLUDED IN THIS DISCLOSURE STATEMENT.

## NOTICE

**PARTIES SHOULD CONSULT WITH THEIR OWN COUNSEL, ACCOUNTANTS AND/OR TAX ADVISORS WITH RESPECT TO THE LEGAL EFFECTS AND OTHER CONSEQUENCES OF THE PLAN.**

MEI 20730291v.1

# TABLE OF CONTENTS

TABLE OF CONTENTS...........................................................................................................1

I.       INTRODUCTION ...........................................................................................3

II.      PURPOSES AND LIMITATIONS OF DISCLOSURE STATEMENT...................4

         A.     Purpose of Disclosure Statement ............................................................4
         B.     Definitions and Exhibits ......................................................................4
         C.     Representations and Limitations............................................................4
         D.     Important Dates ...................................................................................5
         E.     Solicitation Procedures .......................................................................6
         F.     Inquiries ..............................................................................................6

III.     BACKGROUND ............................................................................................7

         A.     Nature of the Debtor ............................................................................7
         B.     The Debtor's Secured Debt with TD Bank............................................7
         C.     Other Pre-Petition Debts Owed by the Debtor .....................................7
         D.     The Debtor's Assets.............................................................................9
         E.     Events Preceding the Chapter 11 Filing................................................9

IV.     SIGNIFICANT EVENTS DURING THE CHAPTER 11 CASE ......................10

V.      THE DEBTOR'S LITIGATION ...................................................................10

         A.     The Litigation.....................................................................................10
         B.     The Litigation Proceeds ......................................................................12

VI.     DESCRIPTION OF THE PLAN OF REORGANIZATION................................13

         A.     Introduction........................................................................................13
         B.     Classes of Claims ..............................................................................14

VII.    IMPLEMENTATION OF THE PLAN ..........................................................17

         A.     Sources of Cash Available on the Effective Date...................................17
         B.     The Sale Procedures............................................................................18
         C.     The Litigation Proceeds and Available Cash .......................................21
         D.     Executory Contracts and Unexpired Leases .........................................21
         E.     Unsecured Claims ..............................................................................21
         F.     Plan Distributions by the Disbursing Agent .........................................23
         G.     Miscellaneous ....................................................................................24

VIII.   CERTAIN TAX CONSEQUENCES OF THE PLAN ....................................25

MEI 20730291v.1

|       | A. | General .............................................................................................. | 25 |
|       | B. | Tax Consequences of Payment of Allowed Claims Pursuant to Plan, Generally .............................................................................................. | 26 |
| IX.   |    | CONFIRMATION OF PLAN—REQUIREMENTS ....................................... | 26 |
|       | A. | Feasibility ......................................................................................... | 27 |
|       | B. | "Best Interest of Creditors" ................................................................. | 27 |
|       | C. | "Cram Down" ..................................................................................... | 28 |
| X.    |    | EFFECT OF CONFIRMATION OF THE PLAN ............................................ | 29 |
|       | A. | Authority to Effectuate the Plan .......................................................... | 29 |
|       | B. | Binding Effect .................................................................................... | 29 |
|       | C. | Discharge .......................................................................................... | 29 |
|       | D. | INJUNCTION ................................................................................... | 29 |
|       | E. | RELEASE .......................................................................................... | 30 |
|       | F. | EXCULPATION ................................................................................. | 30 |
|       | G. | Retention of Jurisdiction ..................................................................... | 30 |
| XI.   |    | CONFIRMATION HEARING ................................................................... | 32 |
| XII.  |    | RECOMMENDATION ............................................................................. | 32 |

ME1 20730291v.1

**PLEASE READ THIS DISCLOSURE STATEMENT CAREFULLY. THIS DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE PLAN THAT IS ENCLOSED WITH THIS DISCLOSURE STATEMENT. THE PROPONENT BELIEVES THAT THE PLAN IS IN THE BEST INTERESTS OF CONGREGATION BIRCHOS YOSEF (THE "DEBTOR") AND ITS CREDITORS AND PROVIDES THE HIGHEST AND MOST EXPEDITIOUS RECOVERIES TO HOLDERS OF ALLOWED CLAIMS AGAINST THE DEBTOR.**

## I.    INTRODUCTION

The Proponent, TD Bank, N.A. ("TD Bank"), is the Debtor's largest secured creditor, holding a secured claim in excess of $9.2 million. TD Bank extended certain commercial mortgage loans to the Debtor, which went into default. A foreclosure action was commenced, and in December 2014, judgment was entered in TD Bank's favor (the "Foreclosure Judgment").

The foreclosure action was commenced in February 2013. Current management of the Debtor alleges that prior Trustees violated duties to the Debtor and engaged in improper actions by allowing the mortgage loans from TD Bank to go into default. TD Bank takes no position on those allegations, and merely notes that in the two years preceding the filing of this bankruptcy proceeding, and since the filing of the bankruptcy petition, the Debtor has not proposed a plan to satisfy claims of creditors.

Interest is accruing on the Foreclosure Judgment held by TD Bank at the rate of 9% per annum, or approximately $67,000 per month. In the four (4) months since the bankruptcy petition was filed, approximately $250,000 of interest has accrued, to the detriment of unsecured creditors and the Debtor. Monthly revenue and expenses of the Debtor are approximately the same, and thus there are no funds today to satisfy creditor claims or to reorganize. Yet administrative claims are being incurred, interest is running on sums due the Internal Revenue Service and real estate taxes are not being paid. This again is to the detriment of the creditors and the Debtor.

It is thus for the benefit of all creditors—and in the best interest of the Debtor itself—that TD Bank proposes a Chapter 11 plan of reorganization (the "Plan"), which provides for the swift sale of the Debtor's real property (with limited exceptions), and to use those sale proceeds and other proceeds to pay creditors in full, as further detailed in the Plan.

Given this proposed treatment, in both dollars and timing, the Proponent believes that the Plan's treatment to creditors surpasses any alternatives that may be presented. Accordingly, the Proponent recommends that all parties entitled to vote on the Plan vote to accept the Plan.

ME1 20730291v.1

## II.    PURPOSES AND LIMITATIONS OF DISCLOSURE STATEMENT

### A.    Purpose of Disclosure Statement

The purpose of this Disclosure Statement is to set forth information that (i) summarizes the Plan (and alternatives to the Plan), (ii) advises Holders of Claims of their rights under the Plan, (iii) assists Creditors entitled to vote in making informed decisions on whether they should vote to accept or reject the Plan and (iv) assists the Bankruptcy Court in determining whether the Plan complies with the provisions of Chapter 11 of the Bankruptcy Code and should be confirmed.[1]

You are urged to read this Disclosure Statement to determine what rights you may have to vote on or object to the Plan and before making any decisions on any such course of action. Particular attention should be directed to the provisions of the Plan affecting or impairing your rights as they existed before the commencement of the Chapter 11 Case.

Please note, however, that this Disclosure Statement cannot tell you everything about your rights. For instance, this Disclosure Statement cannot and does not provide a complete description of the financial status of the Debtor, all of the applicable provisions of the Bankruptcy Code, certain tax implications or other matters that may be deemed significant by Creditors or other parties in interest. You are also encouraged to consult with your lawyer and/or advisors and consider this Disclosure Statement and the Plan to enable you to obtain more specific advice on how the Plan will affect you.

### B.    Definitions and Exhibits

Definitions  Unless otherwise defined herein, capitalized terms used in this Disclosure Statement shall have the meanings ascribed to such terms as used in the Plan.

Exhibits  The following exhibits are annexed hereto and expressly incorporated herein:

| | |
|---|---|
| Exhibit A: | A copy of the Plan |
| Exhibit B: | The Disclosure Statement Order and Confirmation Hearing Notice |
| Exhibit C: | A Ballot and return envelope |

### C.    Representations and Limitations

**NO PERSON IS AUTHORIZED IN CONNECTION WITH THE PLAN OR THE SOLICITATION OF VOTES THEREON TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS ANNEXED HERETO OR INCORPORATED HEREIN BY REFERENCE OR REFERRED TO HEREIN, AND IF GIVEN OR MADE, SUCH INFORMATION MAY NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE PROPONENT.**

---

[1] All capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan.

ME1 20730291v.1

NO REPRESENTATIONS CONCERNING THE DEBTOR OR THE PLAN ARE AUTHORIZED OTHER THAN AS SET FORTH HEREIN.  ANY REPRESENTATIONS OR INDUCEMENTS TO SECURE YOUR ACCEPTANCE OF THE PLAN OTHER THAN AS CONTAINED HEREIN SHOULD NOT BE RELIED UPON BY YOU.

THE INFORMATION AND FINANCIAL DATA RELIED ON BY THE PROPONENT IN FORMULATING THE PLAN AND CONTAINED IN THIS DISCLOSURE STATEMENT IS BASED LARGELY ON (A) DATA OF THE DEBTOR AS PROVIDED TO THE BANKRUPTCY COURT IN THE DEBTOR'S SCHEDULES, MONTHLY OPERATING REPORTS OR OTHER FILINGS, (B) OTHER INFORMATION AS PROVIDED BY THE DEBTOR TO THE PROPONENT, (C) INFORMATION FROM THE DEBTOR TO THE PROPONENT GENERATED PRIOR TO THE PETITION DATE OR (D) OTHER PUBLIC INFORMATION.  THE PROPONENT REPRESENTS THAT EVERYTHING STATED IN THIS DISCLOSURE STATEMENT IS TRUE TO THE BEST OF THE PROPONENT'S KNOWLEDGE AS OF THE DATE OF THIS DISCLOSURE STATEMENT.

THIS DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN, AND NOTHING CONTAINED HEREIN SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE PROPONENT, THE DEBTOR OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE ADVICE ON THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON HOLDERS OF CLAIMS AGAINST THE DEBTOR.

THIS DISCLOSURE STATEMENT AND THE PLAN PROVIDE FOR INJUNCTIVE RELIEF AS TO THE DEBTOR.  THE PERMANENT INJUNCTIONS SET FORTH IN THE PLAN WILL APPLY TO HOLDERS OF ANY CLAIM, INTEREST, LIEN, ENCUMBRANCE OR DEBT, WHETHER SECURED OR UNSECURED, GRANTED PRIORITY STATUS, INCLUDING TAX (FEDERAL OR STATE) OR NON-PRIORITY UNSECURED CLAIM.  CREDITORS WILL BE BOUND BY THIS INJUNCTIVE RELIEF UNLESS CREDITORS TIMELY FILE OBJECTIONS IN ACCORDANCE WITH THE PROVISIONS SET FORTH IN THE DISCLOSURE STATEMENT ORDER HEREIN AND APPEAR AT THE CONFIRMATION HEARING TO PROSECUTE ANY OBJECTION.

**D.  <u>Important Dates</u>**

The Bankruptcy Court approved this Disclosure Statement through the Disclosure Statement Order entered on _____, 2015, after notice and hearing and in accordance with Section 1125 of the Bankruptcy Code.  The Bankruptcy Court found that the information contained herein is of the kind, and is sufficiently detailed, to enable a hypothetical, reasonable investor typical of the Class being solicited to make an informed judgment concerning the Plan. **THE BANKRUPTCY COURT, HOWEVER, HAS NOT CONFIRMED THE PLAN, NOR IS THIS DISCLOSURE STATEMENT OR THE DISCLOSURE STATEMENT ORDER TO BE CONSTRUED AS APPROVAL OR ENDORSEMENT OF THE PLAN BY THE BANKRUPTCY COURT.**

ME1 20730291v.1

As stated in the Disclosure Statement Order and Notice of Confirmation Hearing (see **Exhibit B**), the Bankruptcy Court has scheduled a hearing to consider Confirmation of the Plan for _____ ___, 2015 at __:__ .m.  Holders of Claims and other parties in interest may attend the Confirmation Hearing. Objections to Confirmation of the Plan must be filed on or before _____ ___, 2015, as set forth in the Disclosure Statement Order.

All Ballots concerning the Plan must be completed in full and signed to be counted in the tabulation of the votes, and must be received by the Balloting Agent no later than __:__ p.m. on _____ ___, 2015.

Completed and signed Ballots should be returned by first-class mail to the Balloting Agent at the below address in the enclosed self-addressed return envelope:

> **McCARTER & ENGLISH, LLP**
> Attn: Matthew Heimann
> Four Gateway Center
> 100 Mulberry Street
> Newark, New Jersey 07102

### E.    Solicitation Procedures

Creditors holding Claims that are Impaired have the right to vote to accept or reject the Plan.  Generally, a Claim is Impaired if the Plan alters the legal, contractual or equitable rights of the Holder of the Claim.  A Class of Creditors accepts the Plan when Creditors holding two-thirds in amount of such Class and more than one-half in number of the Claims in such Class who actually cast their Ballots vote to accept the Plan.

In this Chapter 11 Case, the Proponent believes that all Classes of Claims are Impaired because such legal, equitable or contractual rights have been altered in that payment on Allowed Claims will not occur as of the Effective Date—notwithstanding that the Plan proposes to pay all Allowed Claims in full.  Thus, all Holders of Claims are entitled to vote to accept or reject the Plan.

### F.    Inquiries

If you have any questions about the packet of materials that you have received, please contact Joseph Lubertazzi, Jr., Esq. or Matthew Heimann, Esq. of the law firm of McCarter & English, LLP, counsel to the Proponent, Four Gateway Center, 100 Mulberry Street, Newark, New Jersey 07102, or by telephone at (973) 622-4444 during normal business hours.

ME1 20730291v.1

## III.  BACKGROUND

### A.  Nature of the Debtor

The Debtor is a religious corporation formed under the New York Religious Corporations Law in January 1985 for the purposes of creating and maintaining a "House of Worship" in accordance with the traditions of the Hebrew faith and to serve and advance the affairs of the surrounding community.  The Debtor's formation documents also provide that it was formed, among other reasons, to purchase and sell both real and personal property, and to mortgage and lease real and personal property as may be necessary for the conduct and welfare of the Debtor.

The Real Property owned by the Debtor is located in Rockland County, New York.

### B.  The Debtor's Secured Debt with TD Bank

In January 2012, TD Bank advanced the Debtor $7.7 million in a term loan and a line of credit, both secured in part by mortgage liens on the TD Mortgaged Properties and security interests in virtually all of the Debtor's personal property (such as its choses in action and general intangibles).[2]  Later that year, the Debtor defaulted on its obligations to TD Bank, and in February 2013, TD Bank commenced its foreclosure action.  Despite the lapse of two years from its default, plus the intervention of new management, the Debtor could not repay TD Bank or resolve its default.  On December 4, 2014, the Foreclosure Judgment was entered.

The Foreclosure Judgment ordered and adjudged, among other things, that interest will accrue on all sums due under the Foreclosure Judgment at the lawful rate of 9% per annum, and that each of the TD Mortgaged Properties are to be sold by the foreclosure referee at a public auction until the amount due to TD Bank under the Foreclosure Judgment is satisfied.  The Chapter 11 Case was commenced before the foreclosure sale could occur.

TD Bank timely filed its Proof of Claim, which provides that, as of the Petition Date, the amount due under the Foreclosure Judgment is $9,224,289.16.  TD Bank's Proof of Claim also includes TD Bank's reservation of all rights to seek payment of any and all amounts to which it may be entitled under Section 506(b) of the Bankruptcy Code, among other reservation of rights.

The TD Secured Claim is classified under Class 1 in the Plan.

### C.  Other Pre-Petition Debts Owed by the Debtor

The Debtor's Schedules, Filed Proofs of Claim and other information obtained by TD Bank reveal other pre-petition debts owed by the Debtor:

- The IRS Secured Claim.  The Department of Treasury – Internal Revenue Service (the "IRS") filed a Proof of Claim in the amount of $255,052.87 (the "IRS Secured Claim") for the Debtor's failure to pay what the IRS describes as "WT-

---

[2] For more information on the TD Secured Claim and the documents in support thereof, the Proponent refers all parties to TD Bank's proof of claim, filed with the Bankruptcy Court on April 2, 2015 (identified as Claim No. 5).

MEI 20730291v.1

FICA" taxes. To secure the IRS Secured Claim, the IRS filed notices of tax liens on June 14, 2013 and on July 25, 2013. The IRS Secured Claim is secured by all of the Debtor's right, title and interest to property—which includes in part (i) a first Lien against the IRS Lien Properties (discussed below) and (ii) a Lien subordinate to TD Bank's Liens against the TD Mortgaged Properties. The IRS Secured Claim is classified under Class 2 in the Plan.

- The Mechanic's Claims.  (i) All Security & Communications Corp. holds a Disputed Secured Claim in the amount of $57,221.96,[3] allegedly secured against Real Property known as the 201 Route 306 property (which is one of the TD Mortgaged Properties), and (ii) Countrywide Carting Ltd. holds a Disputed Secured Claim in the amount of $5,563, also allegedly secured against the 201 Route 306 property. These two Claims are together defined as the "Mechanic's Claims" and are classified under Class 3 in the Plan.

- The TCF Secured Claim.  TCF Equipment Finance, a division of TCF National Bank ("TCF") holds a Secured Claim in the amount of $143,154.90 (the "TCF Secured Claim").  The TCF Secured Claim is secured by four vehicles (collectively, the "Vehicles") owned by the Debtor.  Both the Schedules and TCF's Proof of Claim value the Vehicles in an amount greater than the TCF Secured Claim.  As of July 9, 2015, TCF has a pending motion for relief from the automatic stay relating to the Vehicles.  The TCF Secured Claim is classified under Class 4 in the Plan.

- The Real Estate Tax Claims.  The Debtor is indebted to the County of Rockland and the Town of Ramapo for unpaid real estate taxes relating to the TD Mortgaged Properties (together, the "Real Property Tax Claims").  The Proponent believes that the Real Property Tax Claims are in excess of $577,000; however, the Debtor's Schedules reveal that the Debtor is challenging some of the Real Property Tax Claims and the amounts may be less.  The Debtor has retained special counsel to address some of the Real Property Tax Claims and continue with litigation.  Also, the deadline for governmental units to File Proofs of Claim has not yet expired.  As such, the amount of Real Property Tax Claims is subject to change.

  The Plan provides that when a particular parcel of the TD Mortgaged Properties is sold, the allocated portion of the Allowed Real Property Tax Claims secured by the specific TD Mortgaged Property will be designated as Closing Costs and paid from the gross proceeds of the respective sales.

---

[3] The Schedules list this Claim as Disputed in the amount of $50,000; however, the corresponding Proof of Claim is Filed in the amount of $57,221.96.

ME1 20730291v.1

- General Unsecured Claims. The Schedules indicate that the Debtor owes approximately $972,000, collectively, to Holders of Unsecured Claims, with approximately $300,000 listed as disputed, contingent or unliquidated. In addition, the claims register maintained in the Chapter 11 Case reflects approximately $520,000 of Unsecured Claims. Given the overlap of scheduled and Filed Claims, the Proponent estimates the total amount of Unsecured Claims to be approximately $1,000,000 (the "General Unsecured Claims"); however, this amount is an estimation and a full Claims analysis has not yet been completed. The General Unsecured Claims are classified under Class 5.

## D.    The Debtor's Assets

According to the Debtor's Schedules, as of the Petition Date, the Debtor holds approximately $31,000,000 in assets, compared to approximately $10,353,000 in liabilities (but this figure is likely larger).

In the Schedules, the Debtor values the TD Mortgaged Properties in the approximate aggregate amount of $24,700,000. These values, however, exceed the values reflected in a confidential appraisal of the TD Mortgaged Properties commissioned and obtained by TD Bank's counsel (the "2015 Appraisals"). The 2015 Appraisals are not subject to public disclosure and are being used internally by the Proponent for the Sale Procedures to provide it with a minimum threshold for accepting sale offers by Stalking Horse(s). The Proponent does note, however, that the 2015 Appraisals ascribe values to the TD Mortgaged Properties in amounts less than those listed in the Schedules by the Debtor.

The Debtor values the IRS Lien Properties in the approximate aggregate amount of $2,000,000, an amount well in excess of the IRS Secured Claim. The 2015 Appraisals do not address the IRS Lien Properties.

The Debtor's personal property is valued in the approximate amount of $4,917,600. This personal property amounts to approximately (i) $400,000 in unpaid rent relating to the 201 Route 306 property, (ii) $180,000 in the Hamaspik Escrow Reserve (as of the Petition Date), (iii) $170,000 for the Vehicles, (iv) $55,000 for "Religious Articles" and (iv) $4,080,000 in litigation claims ($4,000,000 of which are claims against the Former Trustees (defined below)).

## E.    Events Preceding the Chapter 11 Filing

The Debtor has represented in the Chapter 11 Case that its bankruptcy filing was due to certain alleged wrongful actions by its former Board of Trustees (the "Former Trustees").

The Debtor alleges that the Former Trustees (and other individuals) engaged in "a nefarious plot . . . to convert funds rightfully belonging to the Debtor, to divest the Debtor of all but one of its real properties and to convert for themselves the Debtor's remaining real property for no consideration." See Debtor's Complaint in the Insider Action (defined below).

Faced with litigation by the members of the Debtor's congregation, the Former Trustees agreed to resign from the Board of Trustee in November 2013. Additional acts of alleged

9

misconduct, however, were apparently discovered after the Former Trustees resigned. Thus, before the Petition Date, the Debtor was engaged in Litigation to avoid and invalidate the alleged transactions taken by the Former Trustees. Some of this Litigation is pending in State Court or continued as Adversary Proceedings in the Chapter 11 Case.

## IV.   SIGNIFICANT EVENTS DURING THE CHAPTER 11 CASE

- Feb. 26, 2015:   The Petition Date.

- March 18, 2015:   The Debtor commences an Adversary Proceeding against Yeshiva Ohr Torah (Adv. Pro. No. 15-8219).

- March 25, 2015:   The Debtor commences an Adversary Proceeding against Bais Chinuch L'Bonois, Inc. and Bais Malka Girls School of Belz (Adv. Pro. No. 15-8222).

- May 1, 2015:   The Debtor commences an Adversary Proceeding against the Former Trustees and other defendants (Adv. Pro. No. 15-8232).

- May 4, 2015:   The Bankruptcy Court enters Orders approving the Debtor's retention of: (i) Pick & Zabicki LLP as its counsel, (ii) Frances M. Caruso as its bookkeeper and (iii) Montalbano, Condon & Frank, P.C. as its special counsel for Real Property tax-related matters.

- May 5, 2015:   The Bankruptcy Court enters the Bar Date Order, which fixes (i) June 19, 2015 as the deadline for filing Proofs of Claim for non-governmental units and (ii) August 25, 2015 as the deadline for governmental units.

- May 18, 2015:   The Bankruptcy Court enters an Order approving the Debtor's retention of Levine & Associates, PC as special litigation counsel.

- June 26, 2015:   The Debtor's "exclusivity period" under Section 1121 of the Bankruptcy Code expires.

## V.   THE DEBTOR'S LITIGATION

### A.   The Litigation

The Debtor has commenced three Adversary Proceedings. The Debtor also has pre-petition causes of action pending and claims that it may assert, including claims relating to the Real Property Tax Claims. The following is a summary of the claims and causes of action,

ME1 20730291v.1

which are defined collectively as the "Litigation." (Holders of Claims are encouraged to review the Debtor's pleadings filed with the Bankruptcy Court for full details of the Litigation.)

- The Yeshiva Litigation (Adv. Proc. No. 15-8219). The Debtor alleges that Yeshiva Ohr Torah ("Yeshiva") has not made payments to the Debtor for its use and possession of Real Property located at 201 Route 306 (one of the TD Mortgaged Properties). The Debtor alleges that, as of March 4, 2015, Yeshiva owes at least $1,999,999.98 in unpaid rent, plus additional rent afterward at the rate of $66,666.66 per month. The Debtor also seeks a declaratory judgment for full possession of this Real Property, alleging that Yeshiva is a holdover tenant. Yeshiva sought to stay the Yeshiva Litigation and compel arbitration, but the Bankruptcy Court denied that relief on June 26, 2015.

- The Bais Chinuch Litigation (Adv. Pro. No. 15-8222). The Debtor is seeking allegedly unpaid rent from (i) Bais Chinuch L'Bonois, Inc. ("Bais Chinuch") relating to its use and occupancy of Real Property located at 900-906 Route 45 (also one of the TD Mortgaged Properties) and (ii) Bais Malka Girls School of Belz, who is alleged to be the occupying sub-tenant at this Real Property. As of March 25, 2015, the Debtor is seeking to recover at least $755,514.08 in unpaid rent, plus additional rent at the rate of $43,633.33 per month.

  This Litigation arises from pre-petition actions apparently taken by the Former Trustees, who allegedly caused the Debtor to enter into a four-year lease agreement with Bais Chinuch at the rental rate of $1.00 per year. The Debtor is seeking a declaratory judgment to set aside the lease, relief that the Debtor similar sought and recently obtained in a related pending State Court action against Bais Chinuch.[4]

- The Insider Action (Adv. Pro. No. 15-8232). This Litigation is against the Former Trustees (and other defendants), whose actions are alleged by the Debtor to form the basis for the Debtor's financial troubles, pre-petition litigation and, ultimately, the filing of the Chapter 11 Case. The Schedules indicate that the Debtor values its claims against the Former Trustees in the amount of $4,000,000, but the complaint in the Insider Action seeks damages in an amount to be established at trial. The defendants in the Insider Action have been given extensions of time to answer or otherwise respond.

- The Real Property Tax Claims. The Debtor has not paid what is claimed to be owed as real property taxes to the County of Rockland and the Town Ramapo. The Debtor lists in the Schedules that the total Real Property Tax Claims are approximately $125,000, but the Proponent believes—and the Plan provides—that the total amount owed may be as high as $577,000.

---

[4] On June 30, 2015, the State Court granted the Debtor's motion for summary judgment to set aside the subject lease, along with awarding the Debtor attorneys' fees, costs and expenses.

MEI 20730291v.1

The Debtor is a defendant in the County of Rockland's tax-lien foreclosure action for unpaid real property taxes on most of the TD Mortgaged Properties (matter pending). And the Debtor is a plaintiff in a tax certiorari action against the Town of Ramapo (matter pending). The Debtor has retained special counsel to address or litigate matters relating to the Real Property Tax Claims, but the docket in the Chapter 11 Case reflects no activity on which the Proponent can report as of July 9, 2015.

- <u>Other Litigation</u>. The Debtor lists in the Schedules the following pending state-court matters, which are included in the term "Litigation":

  o <u>Hawaii Properties, LLC, et al. v. Debtor</u>, Breach of Contract.

  o <u>Lebovits, et al. v. Debtor, et al.</u>, Enjoin/Set-Aside Conveyances of Properties.

  o <u>Mermelstein, et al. v. Debtor</u>, Breach of Contract for Services.

  o <u>Ganz, et al. v. Debtor</u>, Personal Injury (stay relief granted).

  o <u>Debtor v. Bais Chinuch</u>, Set-Aside Conveyances/Leases of Property (relates to the Bais Chinuch Litigation, and stay relief has been granted).

  o <u>Commissioners of the State Insurance Fund v. Debtor</u>, Collection of Workers' Compensation Insurance Premiums.

  o <u>Zichron Menachem v. Debtor, et al.</u>, Debt Collection.

  o <u>Debtor v. Hamaspik of Rockland County, Inc.</u>, Landlord-Tenant/Eviction (stayed by State Court order).

- <u>Chapter 5 Causes of Action</u>. The Schedules indicate that the Debtor made no pre-petition transfers subject to Section 547 of the Bankruptcy Code. It is unclear whether the Debtor made transfers subject to Section 544 or 548 of the Bankruptcy Code. To the extent that the Debtor holds causes of action under Chapter 5 of the Bankruptcy Code (the "<u>Avoidance Actions</u>"), these causes of action are not included in the term "Litigation." To the extent necessary, any proceeds from the Avoidance Actions shall constitute Available Cash.

**B.    The Litigation Proceeds**

1.    The Plan provides that the Debtor remains in control of the Litigation after the Effective Date. However, all resolutions, settlements, dismissals and any other disposition of the Litigation shall first be approved by the Bankruptcy Court, on notice to the Proponent and other parties in interest. To the extent applicable, the Debtor (or the Disbursing Agent) may continue with any Litigation relating to the Real Property Tax Claims

ME1 20730291v.1

2.    All proceeds resulting from the Litigation, <u>before</u> litigation costs, fees and expenses, resulting from the conclusion, settlement or dismissal of the Litigation are defined in the Plan as the "<u>Litigation Proceeds.</u>"

3.    Under the Plan, the Litigation Proceeds shall be used as follows:[5]

(A)    The first 25% of the Litigation Proceeds shall be used to pay the TD Secured Claim and Proponent Fee Claim (if any balance remains after payment of Closing Costs or from the Net Proceeds), without further Order of the Bankruptcy Court; if the TD Secured Claim has already been satisfied, this 25% shall be designated as Available Cash;

(B)    The next 25% of the Litigation Proceeds shall be designated as Available Cash; and

(C)    The remaining 50% portion of the Litigation Proceeds shall be used to fund the reasonable costs and expenses relating to the Litigation, including payment for any Professionals' Claims arising after the Effective Date—subject to prior Bankruptcy Court approval by way of supplemental fee applications on notice to the Proponent and all parties in interest—with any remaining balance being designated as Available Cash.

4.    The Plan directs the Debtor to turn over all Litigation Proceeds to the Disbursing Agent to be applied in accordance with the Plan. The Disbursing Agent shall hold the Litigation Proceeds in a segregated escrow account prior to making any distributions from the Litigation Proceeds. On the 15th day of each month after the Effective Date, the Debtor and/or Disbursing Agent shall provide the Proponent and its counsel with status updates regarding the Litigation and the balance of the Litigation Proceeds.

5.    As noted, to the extent that the Debtor commences Avoidance Actions, all proceeds generated from the Avoidance Actions shall be designated as Available Cash.

## VI.    **DESCRIPTION OF THE PLAN OF REORGANIZATION**

### A.    **Introduction**

This section summarizes the salient provisions of the Plan, which is annexed to this Disclosure Statement as **Exhibit A**. All parties are encouraged to review the Plan in its entirety for a full understanding of its provisions and impact on Creditors. If there are any inconsistencies between the provisions of this Disclosure Statement and the provisions of the Plan, the provisions of the Plan shall control.

---

[5] Notwithstanding that (a) the TD Secured Claim (and the Foreclosure Judgment) are secured in part by the Debtor's choses in action and general intangibles, among other collateral, and (b) before the Petition Date, TD Bank revoked the Debtor's license to collect rents relating to the TD Mortgaged Properties, the Proponent has determined to use a large portion of the Litigation Proceeds to fund the Plan for the benefit of <u>all</u> Allowed Claims.

ME1 20730291v.1

The Schedules indicate that the Debtor's liabilities are approximately one-third the value of its assets. Yet because the Debtor's assets stem largely from the Real Property that it owns, the Debtor has no available liquidity to repay its debts—in other words, the Debtor is "asset rich" and "cash poor." As a result, the Debtor is operating at a loss and unable to manage its approximately $30,000 per month in ordinary expenses (which does not include its debt-service obligations or other real property tax obligations).[6] The Debtor is also likely accumulating significant administrative expenses in Professional Fee Claims.

Accordingly, the only feasible means for the Debtor to emerge from bankruptcy protection is to sell its Real Property. Given the estimated high fair market value of the Real Property, as stated by Debtor in the Schedules, the Litigation Proceeds and other Available Cash, the Proponent believes that the Debtor can emerge from the Chapter 11 Case in a matter of months, paying all Allowed Claims in full. For these reasons, and in good faith, the Proponent puts forth the Plan that proposes selling all Real Property (except for the Synagogue, unless necessary) for the benefit of the Debtor and all Creditors.

The Plan proposes to pay all Holders of Allowed Claims in full from (i) the Hamaspik Escrow Reserve; (ii) the Net Proceeds of the sale of the Real Property (after payment of the Closing Costs, which includes the Allowed Real Property Tax Claims); (iii) the Litigation Proceeds; and (iv) Available Cash (including charitable donations from the Debtor's community and members and revenue from the Debtor's lease agreements).

Although the Plan proposes to pay all Allowed Claims in full, most of these payments will not all occur on the Effective Date. Therefore, the Proponent considers all Classes to be "Impaired" under the Bankruptcy Code, and thus entitled to vote to accept or reject the Plan.

### B.    Classes of Claims

Administrative Claims, the Professional Fee Claims, the Real Property Tax Claims, the Proponent Fee Claim and other similar Claims pursuant to Section 1123(a)(1) of the Bankruptcy Code are not classified in the Plan. These Claims, instead, will be paid on the Effective Date or as soon as practicable thereafter, and paid from the Hamaspik Escrow Reserve and as Closing Costs from the Real Property sales.

The following chart outlines the classification, treatment and voting rights of the Classes of Claims subject to the Plan (see next page):

---

[6] TD Bank notes that the Debtor has been using TD Bank's cash collateral and/or its property without TD Bank's consent or authorization by the Bankruptcy Court.

14

| CLASS | DESCRIPTION | STATUS / ENTITLE TO VOTE | TREATMENT |
|---|---|---|---|
| 1.<br><br>Secured Claim of TD Bank, N.A. | TD Bank holds an Allowed Secured Claim, secured by, among other things, the TD Mortgaged Properties, the Litigation Proceeds and the Foreclosure Judgment.<br><br>As of the Petition Date, the TD Secured Claim is in the amount of no less than $9,224,289.16.<br><br>Also included in the TD Secured Claim is (i) post-petition interest at 9% per annum and (ii) post-petition attorneys' fees and other fees, costs and charges pursuant to 11 U.S.C. §506(b). | Impaired<br><br>Entitled to Vote | 100%. The TD Mortgaged Properties shall be sold in accordance with the Sale Procedures. The Net Proceeds shall be used to pay the TD Secured Claim in full (after payment for any Allowed Real Property Tax Claims attributed to specific parcels of the TD Mortgaged Properties). The Litigation Proceeds shall also be used to satisfy the TD Secured Claim.<br><br>*All pre-petition Liens in all respects held by TD Bank and those arising from the Foreclosure Judgment shall remain in full force and effect beyond the Effective Date until the TD Secured Claim is paid in full.*<br><br>To the extent that the total Net Proceeds from the TD Mortgaged Properties, the Litigation Proceeds or other collateral are less than the amount of the TD Secured Claim, the deficiency portion of the TD Secured Claim shall be treated as an Allowed Unsecured Claim in Class 5. |
| 2.<br><br>Secured Claim of the Internal Revenue Service | The Department of Treasury – Internal Revenue Service (the "IRS") holds an Allowed Secured Claim, secured in part by the IRS Lien Properties and a valid second Lien against the TD Mortgaged Properties. | Impaired<br><br>Entitled to Vote | 100%. The IRS Lien Properties shall be sold in accordance with the Sale Procedures, and the Net Proceeds shall be used to pay the IRS Secured Claim in full. |

15

| | | | |
|---|---|---|---|
| | As of the Petition Date, the Allowed Secured Claim of the IRS is in the amount of no less than $255,052.87 (the "IRS Secured Claim").<br><br>The IRS's Proof of Claim does not indicate a demand for post-petition interest; however, to the extent that the IRS Secured Claim is entitled to post-petition interest under applicable law, the IRS Secured Claim shall include same. | | Any Net Proceeds from the TD Mortgaged Properties that may exist after satisfying the TD Secured Claim in full shall be used to pay the IRS Secured Claim.<br><br>To the extent that the total Net Proceeds from the IRS Lien Properties (or from the TD Mortgaged Properties after payment on the TD Secured Claim) are less than the amount of the IRS Secured Claim, such deficiency portion shall be treated as an Allowed Unsecured Claim in Class 5.<br><br>To the extent that there are excess Net Proceeds from the sale of the IRS Lien Properties after payment in full of the IRS Secured Claim, the excess Net Proceeds shall be designated as Available Cash. |
| 3.<br><br>Mechanic's Claims | (A) All Security & Communications Corp. and (B) Countrywide Carting Ltd. are scheduled as holding Disputed Secured Claims (together the "Mechanic's Claims") in the amount of $57,221.96 and $5,563, respectively.<br><br>The Mechanic's Claims are scheduled as being secured by liens against Real Property known as the "201 Route 306" property, a parcel of the TD Mortgaged Properties. | Impaired<br><br>Entitled to Vote | Disputed.  If and when the Mechanic's Claims become Allowed Claims, then any Net Proceeds from the sale of the 201 Route 306 property that may exist after satisfying in full (i) the Closing Costs, (ii) the portion of the Allowed Real Property Tax Claims associated with 201 Route 306 and (iii) the TD Secured Claim, shall be used to pay the Allowed Mechanic's Claims. |

16

| | | | Any deficiency portion of the Allowed Mechanic's Claims shall be treated as an Allowed Unsecured Claim in Class 5. |
|---|---|---|---|
| 4.<br><br>Secured Claim of TCF Equipment Finance, a division of TCF National Bank | TCF Equipment Finance, a division of TCF National Bank ("TCF"), holds an Allowed Secured Claim, secured by four vehicles owned by the Debtor (collectively, the "Vehicles").<br><br>As of the Petition Date, TCF's Allowed Secured Claim is in the amount of $143,154.90 (the "TCF Secured Claim"). | Impaired<br><br>Entitled to Vote | 100%. TCF shall repossess the Vehicles and apply the collective fair market value of the Vehicles to satisfy the Allowed TCF Secured Claim.<br><br>Any deficiency portion of the Allowed TCF Secured Claim shall be treated as an Allowed Unsecured Claim in Class 5. |
| 5.<br><br>General Unsecured Claims | Allowed Claims for Holders of General Unsecured Claims, estimated in the amount of $1,000,000 (plus any deficiency portion from Classes 1- 4). | Impaired<br><br>Entitled to Vote | 100%. Payment in full from the Available Cash or the Litigation Proceeds. |
| 6.<br><br>Equity Interests | The Debtor is a non-profit organization and there are no Holders of equity interests. | Not Applicable | All Property of the Estate that remains after the Final Distribution Date shall become property of the Debtor, as reorganized. |

## VII.   IMPLEMENTATION OF THE PLAN

### A.   Sources of Cash Available on the Effective Date

On the Effective Date, as directed by the Confirmation Order, the Proponent will cause the funds in the Hamaspik Escrow Reserve (over $200,000) to be turned over to the Disbursing Agent and held in a segregated escrow account.  The Disbursing Agent will use the Hamaspik Escrow Reserve to make distributions first, to all Holders of Allowed Administrative Claims, and second, to all Holders of Allowed Professional Fee Claims, once such Claims are Allowed by the Bankruptcy Court.  Additional funding may be available from the Litigation Proceeds or Available Cash, but only in accordance with the terms of the Plan.

17

B.    The Sale Procedures

As provided in the Plan, the following Real Property Chart details the Real Property owned by the Debtor and to be sold, free and clear of all claims, liens and interests, subject to the Plan:

| Property | Description and Debtor's Scheduled Values | Classification |
|---|---|---|
| **"Tier One Properties"** | | |
| 1.    900 Route 45 | Religious Girl's School, $4,500,000. | TD Mortgaged Properties |
| 2.    906 Route 45 | Single-Family Residential, $200,000 | TD Mortgaged Properties |
| 3.    78 South Main St. | School for Special Needs Children, $2,000,000 | TD Mortgaged Properties |
| 4.    201 South 306 | Yeshiva/Religious Boy's School, $10,000,000 | TD Mortgaged Properties |
| 5.    18 Ellish Parkway | Single-Family Residential, $1,000,000 | IRS Lien Properties |
| 6.    53 Decatur Ave | Residential Building, $500,000 | IRS Lien Properties |
| 7.    39 Saddle River Rd | Two-Family Residential, $500,000 | IRS Lien Properties |
| **"Tier Two Properties"** | | |
| 8.    4 & 6 Milton Place | Synagogue and Parking Lot, $8,000,000 | TD Mortgaged Properties |
| **Debtor's Total Opinion of Value:  $26,700,000** | | |

The Plan provides for the following "Sale Procedures" to be implemented by the Proponent for the sale of the Real Property and to generate the Net Proceeds (and to pay Closing Costs):

1.    The Sale Procedures shall be overseen and conducted solely by the Proponent, the Broker or as otherwise designated by the Proponent.  The Debtor shall have no involvement or input with the sale of the Real Property.  By virtue of the Confirmation Order, the Sale Procedures will be deemed approved by the Bankruptcy Court.

2.    All Tier One Properties shall be sold by the Broker.  The Proponent will appoint a Broker, with the approval of the Bankruptcy Court, to sell the Tier One Properties and generate Net Proceeds sufficient to satisfy the Allowed Claims in Classes 1 through 5. Net Proceeds from the sale of the 201 Route 306 property shall be used to satisfy the Mechanic's Claims (upon becoming Allowed) in accordance with the terms of the Plan, if

18

there are sufficient Net Proceeds from such sale.

3.    Immediately upon the Effective Date, the Broker shall list and market the Tier One Properties for sale.  The Broker will use 45-Day Period to yield a Stalking Horse or Stalking Horses for any of the Tier One Properties.  (The Proponent reserves the right to extend the 45-Day Period.)  Any Stalking Horse must provide the Broker with the Qualifications necessary to establish the financial wherewithal to consummate the Closing of the respective Tier One Properties. The Broker shall be authorized to provide interested parties with such due diligence and access to the Tier One Properties (whether during the 45-Day Period or prior to any Auction, discussed below) as the Broker in its discretion deems necessary and appropriate.  The Debtor shall permit the Broker or its prospective purchaser(s), professionals and other necessary parties full and complete access to all of the Tier One Properties so that prospective purchasers may conduct necessary due diligence as part of any agreement to purchase same.

4.    For each of the respective Tier One Properties, the Broker (upon consultation with and acceptance by the Proponent) shall only accept a Stalking Horse(s)' offer to purchase the respective Tier One Properties that is in an amount of <u>at least</u> the appraised value of the 2015 Appraisals for the respective Tier One Properties.

5.    Provided that a purchase offer is in an amount of at least the 2015 Appraisals for the respective Tier One Properties, the Broker shall enter into Purchase Agreement(s) with any Stalking Horse for the sale of the respective Tier One Properties.  All Purchase Agreements with any Stalking Horse may include in its terms the Break-Up Fee (<u>i.e.</u>, no more than three percent (3%) of the proposed purchase price and an expense reimbursement for its documented out of pocket expenses).

6.    Any Purchase Agreement with a Stalking Horse shall be subject to (a) higher and better offers and (b) approval by the Bankruptcy Court.  For an offer to be higher and better, it must be for more than the aggregate of the purchase price plus the Break-Up Fee.  Within ten (10) Business Days of execution of a Purchase Agreement, the Broker shall File a Notice with the Bankruptcy Court, pursuant to Local Bankruptcy Rule 2002-2, on notice to the New York Attorney General's Office and all parties in interest (including parties with an unexpired lease interest in the Tier One Properties), setting forth (i) the Real Property to be sold, (ii) the name of the Stalking Horse, (iii) the purchase price, (iv) the minimum price to be a higher or better offer, (v) a deadline, which shall be at least thirty (30) calendar days after the date of such Notice, for submission of higher and better offers, (vi) a date, which shall be no more than ten (10) calendar days after expiration of the foregoing thirty (30) day period, for the Broker to receive any further bids from those parties who have submitted higher and better offers, and from the Stalking Horse and (vii) the earliest possible Bankruptcy Court hearing date thereafter to consider approval of the highest and best offer for the purchase of the respective Tier One Properties.

7.    All Sale Orders approving Purchase Agreements with the Successful Purchaser (<u>i.e.</u>, either the Stalking Horse(s) or such alternate purchaser) shall: (i) authorize payment of the Closing Costs (including the Proponent Fee Claim); (ii) provide that the Broker is

ME1 20730291v.1

authorized to execute and deliver all documents and instruments on the Debtor's behalf as necessary to effectuate the Closing; (iii) provide that the sale of the Tier One Properties be declared tax exempt pursuant to Section 1146(c) of the Bankruptcy Code; and (iv) waive the 14-day stay imposed by Bankruptcy Rule 6004(h), among other provisions that may be deemed reasonably necessary by the Proponent and approved by the Bankruptcy Court.

8.      All Sale Orders shall also provide that the sale of the Tier One Properties are being approved free and clear of all liens, claims and encumbrances, including (without limitation) any property rights of tenants or licensees under Section 365 of the Bankruptcy Code, if any.   Any Claims for rejection damages available to such tenants or licensees under Sections 365 and 502(g) of the Bankruptcy Court shall be Filed with the Bankruptcy Court with thirty (30) calendar days after the entry of such Sale Order.

9.      If the 45-Day Period expires without the Broker entering into Purchase Agreement(s) for the Tier One Properties, then on the first Business Day after the 45th day following the expiration of the 45-Day Period (i.e., approximately ninety (90) days after the Effective Date), the Broker or its designee shall conduct the Auction for the sale of any of the unsold Tier One Properties.  During the period preceding the date of the Auction, the Broker shall market the remaining Tier One Properties in such a manner so as to generate a reasonable price for each of the Tier One Properties.  In accepting any such bid, the Broker shall not be bound by the 2015 Appraisals and may accept bids in an amount less than the 2015 Appraisals.  The Proponent shall have the right to credit bid pursuant to Sections 363(k) of the Bankruptcy Code at the Auction.

10.     At the conclusion of the Auction, the Broker (upon consultation with and acceptance by the Proponent) shall select the highest or otherwise best offer and enter into Purchase Agreement(s) with the Successful Purchaser(s).  Thereupon, the Broker shall submit a proposed Sale Order (consistent with these Sale Procedures) for the Bankruptcy Court to enter, on notice only to the New York State Attorney General's Office. Following entry of such Sale Order, the Broker shall be authorized to consummate the Closing.

11.     With each Closing of the respective Tier One Properties that constitute the TD Mortgaged Properties, the Net Proceeds shall be used first to pay the accrued post-petition interest on the TD Secured Claim and then to pay the remaining amounts owed on the TD Secured Claim.  After payment of the TD Secured Claim, any remaining Net Proceeds shall be applied, in the following order, to (i) the IRS Secured Claim, (ii) the Mechanic's Claims (if Allowed and if the 201 Route 306 property is the property being sold) and (iii) any Proponent Fee Claim that may not have otherwise been satisfied in full from other Closings, with all Net Proceeds remaining thereafter to be designated as Available Cash.

12.     With each Closing of the respective Tier One Properties that constitute the IRS Lien Properties, the Net Proceeds shall be used to pay the IRS Secured Claim in full.  In the event that Net Proceeds remain after payment in full of the IRS Secured Claim and any outstanding Proponent Fee Claim, then such remaining Net Proceeds shall be designated

ME1 20730291v.1

as Available Cash.

13.     The TD Secured Claim shall continue to be secured by the Tier Two Properties.  If the Net Proceeds from the sale of the Tier One Properties are insufficient to pay the TD Secured Claim in full, then immediately following the Closing of the last Tier One Properties, the remaining amount of the TD Secured Claim shall be calculated.  The Debtor or Disbursing Agent shall have forty-five (45) days thereafter to pay the Proponent the amount of such remaining Claim.  If the Debtor or Disbursing Agent fails to make such payment, the Proponent may proceed to a foreclosure sale of the Tier Two Properties in accordance with the Foreclosure Judgment.

14.     The Proponent reserves the right to modify the Sale Procedures as may be necessary to address unforeseen issues relating to the sale of the Real Property, without prior Bankruptcy Court approval, so long as such modifications do not materially affect the Sale Procedures.

### C.      **The Litigation Proceeds and Available Cash**

As discussed above, the Litigation Proceeds and other Available Cash shall also be used to pay Allowed Claims, in accordance with the terms of the Plan.

### D.      **Executory Contracts and Unexpired Leases**

All Executory Contracts and Unexpired Leases shall be rejected under the Plan.

Any party to an Executory Contract or Unexpired Lease that is being rejected in accordance with the Plan shall File a Proof of Claim for damages from such rejection no later than either thirty (30) days after the Effective Date or thirty (30) days after entry of the Sale Order, as applicable.  The failure to File a Proof of Claim shall be deemed a waiver of any Claim in connection with the rejection of such Executory Contract or Unexpired Lease.

### E.      **Unsecured Claims**

#### 1.      **Objections to Claims**

The Debtor—or the Disbursing Agent, on behalf of the Debtor—shall be responsible for pursuing objections to any Disputed Unsecured Claims not Allowed as of the Effective Date, ***except as to*** (i) any challenge to the TD Secured Claim and (ii) any Claims relating to the Sale Procedures or effectuating the terms thereof.  To the extent applicable, the Debtor or the Disbursing Agent may also continue with any Litigation relating to any Disputed Real Property Tax Claims.

#### 2.      **Filing Objections**

With respect to any Disputed Unsecured Claims, the Debtor or the Disbursing Agent shall File and serve all objections to the Allowance of such Claims no later than ninety (90) days

21

after the Effective Date, unless as otherwise ordered by the Bankruptcy Court. Additional details on the procedures for objecting to a Disputed Unsecured Claim are provided for in the Plan.

### 3.    **Disallowance of Claims Without Further Order of the Court**

As of the Effective Date, any Scheduled Claim designated as disputed, contingent or unliquidated in amount, and for which a Proof of Claim has not been Filed by the Bar Date, shall be deemed expunged, without further act or deed. All Claims listed on the Schedules that correspond to a Proof of Claim filed by a particular Holder shall be deemed to have been superseded by such later filed Proof of Claim and the Claims listed on the Schedules, regardless of priority, shall be expunged from the claims register; provided, however, that such Proofs of Claim shall be subject to objection in accordance with the Plan.

### 4.    **The Disputed Claims Reserve**

(a)    Except to the extent the Bankruptcy Court determines that a lesser amount is adequate, the Plan provides that the Disbursing Agent shall create and maintain the Disputed Claims Reserve and deposit in the Disputed Claims Reserve such funds as would be necessary to make the required distribution on the Claim if Allowed, as listed either in the Schedules or the Filed Proof(s) of Claim, whichever is greater.

(b)    For purposes of effectuating the provisions of the Plan and the distributions to Holders of Allowed Claims, the Bankruptcy Court may liquidate the amount of the Disputed Unsecured Claims pursuant to Section 502(c) of the Bankruptcy Code, in which event the amounts so fixed or liquidated shall be deemed to be the amounts of the Disputed Unsecured Claims pursuant to Section 502(c) of the Bankruptcy Code for purposes of distribution under the Plan and for purposes of the Disputed Claims Reserve.

(c)    When a Disputed Unsecured Claim becomes an Allowed Claim, there shall be distributed to the Holder of such Allowed Claim, in accordance with the provisions of the Plan, Cash in the amount of all distributions to which such Holder would have been entitled if such Holder's Claim were Allowed on the Effective Date, to the extent of Available Cash to make such distribution.

(d)    In no event shall (I) any Holder of any Disputed Unsecured Claim be entitled to receive (under the Plan or otherwise) any Cash payment that is greater than the amount reserved, if any, for such Disputed Unsecured Claim pursuant to the Plan; (II) the Disbursing Agent have any responsibility or liability for any loss to or of any amount reserved under the Plan unless such loss is the result of the Disbursing Agent's fraud, willful misconduct, breach of fiduciary duty or gross negligence; and (III) any Creditor whose Disputed Unsecured Claim is subsequently Allowed, pursue or recover or from any other Creditor in respect of any funds received as distributions under the Plan.

(e)    The Disputed Claims Reserve shall be treated as a disputed ownership fund, within the meaning of Treasury Regulation Section 1.468B-9 (i.e., disputed ownership funds), for all purposes associated with taxation.

22

(f)    The Disbursing Agent shall pay, or cause to be paid, out of the funds held in the Disputed Claims Reserve, any tax imposed by any federal, state or local taxing authority on the income generated by the funds or property held in the Disputed Claims Reserve. The Disbursing Agent shall file, or cause to be filed, any tax or information related to the Disputed Claims Reserve that is required by any federal, state or local tax authority.

(g)    To the extent that funds or property remain in the Disputed Claims Reserve after the Allowance of such related Disputed Unsecured Claims, such funds or property shall constitute Available Cash necessary to fund the Plan or returned to the Debtor as its property as of the Final Distribution Date.

**F.    Plan Distributions by the Disbursing Agent**

1.    **General**

As and when authorized by a Final Order, any Disputed Claims that become Allowed Claims shall be paid in accordance with the Plan. No distribution shall be made on a Claim where only a portion of such Claim is Disputed until such Dispute is resolved by settlement or Final Order.

When there exists Available Cash sufficient to satisfy at least 25% of the total Allowed Claims in Class 5, the Disbursing Agent shall make a pro rata distribution to Holders of Allowed Claims in Class 5.

2.    **No Payments of Fractional Cents**

For purposes of administrative convenience, no payment of fractional cents shall be made pursuant to the Plan. Whenever any payment of a fraction of a cent under the Plan would otherwise be required, the actual distribution made shall reflect a rounding of such fraction to the nearest whole penny (up or down), with halfpennies or less being rounded down and fractions in excess of half of a penny being rounded up.

3.    **Setoff and Recoupment**

Except as otherwise provided in the Plan, the Disbursing Agent may, but shall not be required to, set off against, or recoup from, any Claim and the distributions to be made pursuant to the Plan in respect thereof, any Claims or defenses of any nature whatsoever that the Estate may have, but neither the failure to do so nor the allowance of any Claim under the Plan shall constitute a waiver or release of any right of setoff or recoupment against the Holder of any Claim.

4.    **Payment of Taxes on Distributions Received Pursuant to the Plan**

(a)    Any contrary provision in the Plan notwithstanding, as a precondition to payment of any distribution to a Creditor under the Plan, unless included with the Proof of Claim Filed by such Creditor in the Chapter 11 Case, the Plan requires each Creditor to provide Tax Information for purposes of tax reporting by the Disbursing Agent. All Entities that receive distributions

23

under the Plan shall be responsible for reporting and paying, as applicable, any taxes on account of their respective distributions.

(b)      The Plan requires the Disbursing Agent to issue the Tax Info Request in writing from the Creditors. The Plan further provides that any Creditor who fails to respond to the Tax Info Request within ninety (90) days from the date posted on the Tax Info Request, <u>shall forfeit all distributions</u> that such Creditor may otherwise be entitled to under the Plan, and such forfeited funds will revert to being Available Cash to be disbursed or used in accordance with the terms of the Plan.

5.      **Compliance With Tax Withholding and Reporting Requirements**

Concerning all distributions made under the Plan, the Disbursing Agent shall comply with all withholding and reporting requirements of any federal, state or local taxing authority.

G.      <u>Miscellaneous</u>

1.      Post-Confirmation Reports and Fees

The Plan provides in further detail that, until the Final Decree is entered, the Debtor shall submit all post-confirmation reports to the U.S. Trustee as required by the U.S. Trustee guidelines setting forth all receipts and disbursements of the Debtor. The Debtor shall also be responsible for any quarterly fees due to the U.S. Trustee from and after the Effective Date until the Chapter 11 Case is dismissed or closed pursuant to a Final Decree. The Plan also details the Debtor's responsibility for continuing with its business operations.

2.      Severability of Plan Provisions

If, prior to the Confirmation Date, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, on its own motion or at the request of the Proponent, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may be altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

3.      Modification of Plan

The Plan provides that the Proponent may modify the Plan at any time before Confirmation. However, the Bankruptcy Court may require a new Disclosure Statement or re-voting on the Plan if the Proponent materially modifies the Plan before Confirmation.

24

MEI 20730291v.1

4.    Post-Confirmation Dismissal

The Plan provides that a Creditor or party in interest may bring a motion to dismiss the Chapter 11 Case under Section 1112(b) of the Bankruptcy Code, after the Confirmation Date, if there is a default in performing under the Plan.

## VIII.  CERTAIN TAX CONSEQUENCES OF THE PLAN

### A.    General

PURSUANT TO INTERNAL REVENUE SERVICE CIRCULAR 230, THE DESCRIPTION SET FORTH HEREIN WITH RESPECT TO FEDERAL INCOME TAX ISSUES IS NOT INTENDED OR WRITTEN TO BE USED, AND SUCH DESCRIPTION CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING ANY PENALTIES THAT MAY BE IMPOSED ON THE TAXPAYER UNDER FEDERAL INCOME TAX LAW. SUCH DESCRIPTION IS WRITTEN IN CONNECTION WITH THE CONFIRMATION OF THE PLAN AND MAY BE VIEWED AS A MARKETING DOCUMENT BY THE IRS. THIS DESCRIPTION IS LIMITED TO THE SPECIFIC FEDERAL INCOME TAX MATTERS DESCRIBED HEREIN. IT IS POSSIBLE THAT ADDITIONAL ISSUES MAY EXIST THAT COULD AFFECT THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN OR OTHER FEDERAL INCOME TAX MATTERS DISCUSSED HEREIN, AND THIS DISCUSSION DOES NOT CONSIDER OR PROVIDE ANY CONCLUSIONS WITH RESPECT TO ANY SUCH ADDITIONAL ISSUES. EACH TAXPAYER IS STRONGLY URGED TO SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM SUCH TAXPAYER'S INDEPENDENT TAX ADVISOR.

THE    DESCRIPTION    OF    CERTAIN    FEDERAL    INCOME    TAX CONSEQUENCES OF THE PLAN PROVIDED BELOW IS SOLELY FOR THE PURPOSE OF COMPLIANCE WITH SECTION 1125(a) OF THE BANKRUPTCY CODE. THE DESCRIPTION IS BASED ON THE INTERNAL REVENUE CODE OF 1986,    AS    AMENDED    (THE    "INTERNAL    REVENUE    CODE")    TREASURY REGULATIONS,    JUDICIAL    DECISIONS    AND    ADMINISTRATIVE DETERMINATIONS, ALL BELIEVED TO BE IN EFFECT ON THE DATE OF THIS DISCLOSURE STATEMENT. CHANGES IN ANY OF THESE AUTHORITIES OR IN THEIR INTERPRETATION MAY HAVE RETROACTIVE EFFECT, WHICH MAY CAUSE THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN TO DIFFER MATERIALLY FROM THE CONSEQUENCES DESCRIBED BELOW. EXCEPT AS PROVIDED BELOW, NO RULING HAS BEEN REQUESTED FROM THE IRS AND NO LEGAL OPINION HAS BEEN REQUESTED FROM THE PROPONENT'S COUNSEL CONCERNING ANY TAX CONSEQUENCE OF THE PLAN AND NO TAX OPINION OR ADVICE IS GIVEN BY THIS DISCLOSURE STATEMENT.

This description does not cover all aspects of federal income taxation that may be relevant to Holders of Claims or the Debtor.  For example, the description does not address issues of special concerns to certain taxpayers, such as dealers in securities, life insurance

companies, financial institutions, tax exempt organizations and foreign taxpayers, nor is it intended to address all of the possible federal income tax consequences to Holders of Claims in the Debtor. This description also does not discuss the possible state tax (or non-U.S. tax, if applicable) consequences that might apply to Holders of Claims or the Debtor.

**B.      Tax Consequences of Payment of Allowed Claims Pursuant to Plan, Generally**

The federal income tax consequences of implementing the Plan to the Holders of Allowed Claims will depend, among other things, on the consideration to be received by the Holder, whether the Holder reports income on the accrual or cash method, whether the Holder's Claim is Allowed or Disputed and whether the Holder has taken a bad debt deduction or a worthless security deduction with respect to its Claim.

    1.      Recognition of Gain or Loss

In general, a Holder of an Allowed Claim should recognize gain or loss equal to the amount realized under the Plan in respect of its Claim less the Holder's tax basis in the Claim. Any gain or loss recognized in the exchange may be long-term or short-term capital gain or loss or ordinary income or loss, depending upon the nature of the Allowed Claim and the Holder, the length of time that the Holder held the Claim and whether the Claim was acquired at a market discount. If the Holder realizes a capital loss, the Holder's deduction of the loss may be subject to limitation. The Holder's tax basis for any property received under the Plan generally will equal the amount realized.

    2.      Bad Debt or Worthless Security Deduction

A Holder who receives in respect of an Allowed Claim an amount less than the Holder's tax basis in the Claim may be entitled in the year of receipt (or in an earlier or later year) to a bad debt deduction in some amount under Section 166(a) of the Internal Revenue Code. The rules governing the character, timing and amount of bad debt deductions place considerable emphasis on the facts and circumstances of the Holder, the obligor and the instrument with respect to which a deduction is claimed. Holders of Allowed Claims, therefore, are urged to consult their tax advisors with respect to their ability to take such a deduction.

**IX.      CONFIRMATION OF PLAN—REQUIREMENTS**

For the Plan to be confirmed, the Bankruptcy Code requires, among other things, that the Plan be proposed in good faith, that the Proponent disclose specified information concerning payments made or promised to insiders and that the Plan comply with the applicable provisions of Chapter 11 of the Bankruptcy Code. Section 1129(a) of the Bankruptcy Code also requires that at least one Class of Claims has accepted the Plan ("Minimum Voting Threshold"), that Confirmation of the Plan is not likely to be followed by the need for further financial reorganization and that the Plan be fair and equitable with respect to each Class of Claims that is Impaired under the Plan. The Bankruptcy Court can confirm the Plan if it finds that all of the requirements of Section 1129(a) of the Bankruptcy Code have been met. The Proponent believes that the Plan meets all of these required elements.

ME1 20730291v.1

## A.    Feasibility

Concerning the so-called feasibility test (i.e., that the Plan is not likely to be followed by the need for further financial reorganization), the Plan provides for the sale of the Debtor's Real Property and other sources of money will be used to fund and consummate the Plan fully.   As illustrated:

| | |
|---|---|
| Estimated Value of Real Property (except for the Tier Two Properties): | $18,000,000 |
| Less Closing Costs (assumed at 10%, less the Real Property Tax Claims): | ($2,000,000) |
| Less Maximum Amount of the Real Property Tax Claims | ($580,000) |
| ***Estimated Net Proceeds***: | $15,420,000 |
| Less TD Secured Claim (as of the Petition Date): | ($9,224,000) |
| Less IRS Secured Claim (as of the Petition Date): | ($255,000) |
| Less Mechanic's Claims (assuming Allowed): | ($63,000) |
| ***Available Cash after the Tier One Properties are sold***: | $5,878,000 |
| Plus Hamaspik Reserve Account: | $200,000 |
| ***Approximate Total for Unsecured Claims*** (without use of Litigation Proceeds) | $6,078,000 |

Notably, this illustration does not involve the Tier Two Properties, which the Debtor values at approximately $8,000,000.   Nor does it include the Litigation Proceeds or other Available Cash.   Yet regardless of these additional sources of funding, it is apparent that the Plan is more than feasible.   The Plan also provides for a substantial amount of Available Cash for the Debtor upon the Final Distribution Date.   Accordingly, this aspect for Plan Confirmation is satisfied.

## B.    "Best Interest of Creditors"

Under the "best interest of creditors" test, the Plan is confirmable if, with respect to each Impaired Class of Claims, each Holder of an Allowed Claim in such Class has either (i) accepted the Plan, or (ii) receives or retains under the Plan, on account of its Claim, property of a value, as of the Effective Date, that is not less than the amount such holder would receive or retain if the Debtor were to be liquidated under Chapter 7 of the Bankruptcy Code.

27

To determine what the Holders of each Class of Claims would receive if the Debtor were to be liquidated under Chapter 7 of the Bankruptcy Code, the Bankruptcy Court generally determines the dollar amount that would be generated from the liquidation of the Debtor's assets in a Chapter 7 liquidation case.

Here, the Real Property is subject to the TD Secured Claim, the IRS Secured Claim and the Real Property Tax Claims (and possibly the Mechanic's Claims). The Plan proposes selling the Real Property and satisfying all Allowed Secured Claims by first paying the Closing Costs and then from the Net Proceeds, much like what would occur in a Chapter 7 liquidation. Thus, a similar distribution result as illustrated in the above chart would likely occur in a Chapter 7 liquidation scenario. However, the Proponent believes that a conversion of the Bankruptcy Case to Chapter 7—which could only occur under the Bankruptcy Code if the Debtor consents—would not only duplicate the process being proposed by the Plan process, but would harm Creditors by adding additional delay and layers of expense, and harm the Debtor by blindly liquidating the Tier Two Properties at the same time as the Tier One Properties. A conversion of the Chapter 11 Case would also harm the Professionals, as Administrative Claims incurred in the Chapter 11 Case become subordinate to Administrative Claims incurred while the case proceeded under Chapter 7.

Thus, the Proponent strongly believes that the Plan satisfies the "best interest of creditors" test, and, indeed that the Plan is in the best interests of Creditors, as well as the Debtor. The Plan also surpasses that of a straight Chapter 7 liquidation.

### C.    "Cram Down"

In the event that a Class of Claims votes to reject the Plan, the Plan will not satisfy all of the requirements of Section 1129(a) of the Bankruptcy Code.  The Bankruptcy Court nevertheless may confirm the Plan under the "cram down" provisions of Section 1129(b) of the Bankruptcy Code, if all of the other provisions of Section 1129(a) of the Bankruptcy Code are met.

With all Allowed Claims proposed to be paid in full, the Proponent does not foresee having to invoke the "cram down" provisions. Nevertheless, to the extent necessary, the Proponent intends (i) to undertake to have the Bankruptcy Court confirm the Plan under the "cram down" provisions of Section 1129(b) of the Bankruptcy Code and (ii) to amend the Plan to the extent necessary to obtain entry of the Confirmation Order.

Under Section 1129(b) of the Bankruptcy Code, on request of the Proponent, the Bankruptcy Court, "shall" confirm the Plan if it does not discriminate unfairly and is fair and equitable with respect to each dissenting Class of Claims that is Impaired. The Plan is "fair and equitable" as to a Class of Unsecured Claims if, at a minimum, it satisfies the "absolute "priority rule" and the "best interests of creditors" test.

To satisfy the absolute priority rule, the Plan must provide that the Holder of any Claim that is junior to the Claims of the dissenting Class will not receive or retain under the Plan on account of such junior Claim any property unless the Claims of the dissenting Class are paid in full. Here, as noted, all Allowed Claims are being paid in full, and so the Plan satisfies the

28

absolute priority rule. The Proponent has also established above that the Plan satisfies the "best interest of creditors" test. Accordingly, in the unlikely event that the Plan must be confirmed by way of "cram down," the Plan satisfies the criteria for doing so.

## X.   EFFECT OF CONFIRMATION OF THE PLAN

The Plan provides that Confirmation will have the following effects on the Estate and Creditors:

### A.   Authority to Effectuate the Plan

Upon the Effective Date, all matters provided under the Plan shall be deemed to be authorized and approved without the requirement of further approval from the Bankruptcy Court or the Proponent, except as may be required under the Sale Procedures. The Proponent, Broker and Disbursing Agent shall, as applicable, be authorized, without further application to or Order of the Bankruptcy Court, to take whatever action necessary to carry out the Plan and effectuate the transactions provided for thereunder.

### B.   Binding Effect

Except as otherwise expressly provided in the Plan, on and after the Effective Date, the Plan shall bind all Holders of Claims, whether or not such Holders voted to accept or reject the Plan.

### C.   Discharge

The Plan provides that, upon the Final Distribution Date, the Debtor shall be discharged of liability for payment of debts incurred before the Effective Date to the extent specified in 11 U.S.C. §1141. Any liability imposed by the Plan will not be discharged, however. If the Plan is not confirmed, the Plan shall be deemed null and void. In such event, nothing contained in the Plan shall be deemed to constitute a waiver or release of any Claims against the Debtor or the Estate or any other Persons, or to prejudice in any manner the rights of the Proponent, the Debtor, the Estate or any person in any further proceeding involving the Debtor or the Estate. The provisions of the Plan shall be binding upon the Debtor and all Creditors, regardless of whether such Claims are Impaired or whether such parties have voted to accept the Plan.

Moreover, except as the Plan otherwise provides, Property of the Estate shall revest in the Debtor as of the Final Distribution Date. For the avoidance of doubt, the Foreclosure Judgment and all Liens in effect as of the Petition Date shall remain in full force and effect against Property of the Estate until such Property of the Estate is sold or the Allowed Claims secured by the Foreclosure Judgment and such Liens are satisfied in full.

### D.   INJUNCTION

**UPON THE EFFECTIVE DATE, EXCEPT AS OTHERWISE PROVIDED FOR IN THE PLAN OR CONFIRMATION ORDER, THE CONFIRMATION ORDER SHALL ACT AS AN INJUNCTION AGAINST THE COMMENCEMENT OR**

29

CONTINUATION OF ANY ACTION, EMPLOYMENT OF PROCESS OR ACT TO COLLECT, OFFSET OR RECOVER A CLAIM AGAINST THE DEBTOR OR PROPERTY.    EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, ALL PERSONS WHO HAVE HELD, HOLD OR MAY HOLD CLAIMS AGAINST THE DEBTOR OR ITS PROPERTY SHALL BE PERMANENTLY ENJOINED, ON AND AFTER THE EFFECTIVE DATE, FROM (A) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND WITH RESPECT TO ANY SUCH CLAIM, (B) THE ENFORCEMENT, ATTACHMENT, COLLECTION OR RECOVERY BY ANY MANNER OR MEANS OF ANY JUDGMENT, AWARD, DECREE OR ORDER AGAINST THE DEBTOR ON ACCOUNT OF ANY SUCH CLAIM AND (C) CREATING, PERFECTING OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST THE DEBTOR OR AGAINST THE PROPERTY OR INTERESTS IN PROPERTY OF THE DEBTOR AFTER THE EFFECTIVE DATE ON ACCOUNT OF ANY SUCH CLAIM, EXCEPT TO ENFORCE THE PROVISIONS OF THE PLAN.

E.    **RELEASE**

ON THE DATE OF ENTRY OF THE FINAL DECREE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, NONE OF THE EXCULPATED PARTIES SHALL HAVE OR INCUR LIABILITY FOR, AND ARE HEREBY RELEASED FROM ANY OBLIGATION TO ONE ANOTHER, TO ANY HOLDER OF A CLAIM OR ANY OTHER PARTY IN INTEREST OR PERSON, FOR ANY ACT OR OMISSION THAT OCCURRED PRIOR TO THE DATE OF ENTRY OF THE FINAL DECREE AND THAT RELATES TO THE DEBTOR AND THE DEBTS OWED BY THE DEBTOR, EXCEPT FOR ACTS OF GROSS NEGLIGENCE, WILLFUL MISCONDUCT OR FRAUD, AND EACH EXCULPATED PARTY SHALL IN ALL RESPECTS BE ENTITLED TO REASONABLY RELY UPON THE ADVICE OF COUNSEL WITH RESPECT TO THEIR DUTIES AND RESPONSIBILITIES (IF ANY) UNDER THE PLAN.

F.    **EXCULPATION**

ON THE EFFECTIVE DATE, EACH OF THE EXCULPATED PARTIES ARE GRANTED THE PROTECTIONS AND BENEFITS OF SECTION 1125(e) OF THE BANKRUPTCY CODE.

G.    **Retention of Jurisdiction**

The Plan provides that, from the Effective Date until entry of the Final Decree closing the Chapter 11 Case, the Bankruptcy Court shall retain jurisdiction of the Chapter 11 Case for the following purposes:

     i.    To hear and determine any and all objections to the Allowance of any Claim (including, without limitation, Administrative Claims and Professional Fee Claims) or any controversy as to the classification of Claims or any matters that may directly, indirectly or contingently affect the obligations of the Debtor to any

ME1 20730291v.1

Creditors, Holders of Claims or other parties in interest;

ii.  To hear and determine any and all applications for compensation and reimbursement of expenses by the Professionals, the Proponent (if applicable), the Balloting Agent (if applicable) or the Disbursing Agent;

iii.  To adjudicate through final judgment any contested matters or adversary proceedings as may be pending or subsequently initiated in the Bankruptcy Court—including, without limitation, the Litigation and the Avoidance Actions, if applicable—and to grant any and all Orders, releases, injunctions and exculpations similar in scope to the releases, injunctions and exculpations that could have been granted by Orders of the Bankruptcy Court prior to the Effective Date;

iv.  To enforce and interpret the provisions of the Plan and the Confirmation Order;

v.  To hear and determine any matter relating to the Sale Procedures and implementing and effectuating the Sale Procedures;

vi.  To issue any injunction or other relief appropriate to implement the intent and purpose of the Plan, and to enter such further Orders enforcing any injunctions or other relief issued under the Plan or pursuant to the Confirmation Order;

vii.  To interpret and determine such matters as the Confirmation Order may provide for, or as may be authorized under the Bankruptcy Code; and

viii.  To enter and implement such Orders as may be appropriate in the event that the Confirmation Order is, for any reason, stayed, reversed, revoked modified or vacated.

In addition, the Bankruptcy Court shall retain jurisdiction to implement the provisions of the Plan in the manner as provided under Section 1142(a) and (b) of the Bankruptcy Code. If the Bankruptcy Court abstains from exercising, or declines to exercise jurisdiction, or is otherwise without jurisdiction over any matter set forth in the Plan, then this provision of the Plan shall have no effect upon and shall not control, prohibit or limit the exercise of jurisdiction by any other court, public authority or commission having competent jurisdiction over such matters.

MEI 20730291v.1

## XI.    CONFIRMATION HEARING

The Confirmation Hearing will be held by the Honorable Robert D. Drain, United States Bankruptcy Judge, on _____ __, 2015 at ___:00 _.m. in the United States Bankruptcy Court, Southern District of New York, 300 Quarropas Street White Plains, NY 10601-4140. At the Confirmation Hearing, the Bankruptcy Court will decide whether the Plan should be confirmed, and will hear and decide any and all objections to the Plan.  Any Creditor, or other party in interest who wishes to object to Confirmation of the Plan, or to the classification of Claims provided in the Plan, must, not later than 4:00 p.m. on _____ __, 2015, File an objection with the Clerk's Office, United States Bankruptcy Court, Southern District of New York, 300 Quarropas Street White Plains, NY 10601-4140, and serve a copy of the objection on counsel for the Proponent:

> **McCARTER & ENGLISH, LLP**
> Joseph Lubertazzi, Jr.
> Matthew Heimann
> 245 Park Avenue, 27th Floor
> Four Gateway Center
> 100 Mulberry Street
> Newark, New Jersey 07102
> jlubertazzi@mccarter.com
> mheimann@mccarter.com

Any objection to the Plan that is not Filed and served by the above date may not be considered by the Bankruptcy Court.   Any Person or Entity who Files an objection to Confirmation of the Plan or to the classification of Claims provided in the Plan must also attend the Confirmation Hearing, either in person or through counsel.

## XII.    RECOMMENDATION

The Proponent believes that the Plan provides for the most fair and equitable treatment of the Debtor's Creditors and is in the best interest of the Debtor.   The Proponent therefore recommends that Creditors vote to accept the Plan.

Date: July 9, 2015

TD Bank, N.A.

By: _____

Name:  Kendall V. Jones
Title:   Vice President

32