UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
_____

In re:                              Chapter 11

Congregation Birchos Yosef,         Case No. 15-22254 (RDD)

                Debtor.

_____

### MEMORANDUM OF DECISION ON DEBTOR'S MOTION
### TO ENFORCE THE AUTOMATIC STAY

Appearances:

| | |
|---|---|
| For the Debtor: | Pick & Zabicki, LLP, by Douglas J. Pick, Esq. |
| For Zichron Menochum: | Elizabeth A Haas, Esq. |
| For David Rottenberg: | Hahn & Hessen LLP, by Edward Lee Schnitzer, Esq. |
| For Abraham Schwartz: | Yitzchak E. Cohen, Esq. |
| For Bais Chinuch L'Bonois, Inc. | Ira Daniel Tokayer, Esq. |
| For Yechiel Laufer | Cohen Tauber Spievack & Wagner LLP, by Stephen Wagner, Esq. |
| For the Beis Din Mechon L'Hora'ah | Kera & Graubard, by Mark David Graubard, Esq. |

Hon. Robert D. Drain, United States Bankruptcy Judge:

        This Memorandum of Decision amends and supersedes the

Court's bench ruling, issued at the end of the July 1, 2015

hearing on a motion (the "Motion") of the debtor and debtor in

possession (the "Debtor") to enforce the automatic stay under 11

1

U.S.C. § 362(a) against Bais Chinuch L'Bonois, Inc. ("Bais Chinuch") and certain named individuals and those acting with them, based on their post-bankruptcy invocation of a *beis din* proceeding against principals of the Debtor.   The Court found and concluded that Bais Chinuch and the named individuals violated the automatic stay and that the Motion should be granted, and I have entered an order to that effect.   This Memorandum of Decision sets forth in more detail the reasons for that result.

### Facts

After filing this chapter 11 case, the Debtor commenced an adversary proceeding in this Court against Bais Chinuch and the other subjects of the Motion asserting various claims for fraud, breach of fiduciary duty and looting of the Debtor's assets.   Then Bais Chinuch and the other named defendants invoked a *beis din*, or Jewish religious court, specifically Beis Din Mecho L'Hora'ah, which (a) "invited," or issued a *hazmana* to, the Debtor's principals, though not the Debtor itself, to participate in a *beis din* proceeding regarding the parties' dispute – i.e., the subject matter of the adversary proceeding – and (b), enjoined the Debtor's principals, through an *ekul*, from continuing to pursue the adversary proceeding in this Court.[1] The *hazmana*, or summons, also warned the Debtor's principals that

---

[1] The parties had never agreed to the arbitration of their disputes, including the issues here, before this *beis din*.

if they did not participate in the *beis din* proceeding they could be subject to a *sirov*, which the parties agree at a minimum constitutes a shunning by their religious community and potentially by all Orthodox Jews.

The Debtor's counsel wrote to those who had invoked the *beis din* that they had violated the automatic stay and needed to stop the *beis din* proceeding, and also that the *ekul,* as a violation of the automatic stay, was void *ab initio*. Notwithstanding that warning and Bais Chinuch and the other individuals' knowledge of the commencement of this chapter 11 case (which they had when they invoked the *beis din*), Bais Chinuch and the individuals did not withdraw their request to the *beis din* for relief against the Debtor's principals or seek vacatur of the *ekul*.  In fact, the *beis din* issued a second invitation, or *hazmana*, again informing the Debtor's principals of the potential consequences of ignoring its summons: a *sirov*, or communal shunning, at a minimum.

Based on the record of the hearing, while the full extent of the effect of a *sirov*, if issued, is somewhat unclear, the mere threat of the issuance of a *sirov*, and, in fact, the commencement of the *beis din* proceeding itself, has already adversely affected the Debtor, through its principals, and made it more difficult to conduct this case by exerting significant pressure to cease pursuing the Debtor's claims against those who

3

invoked the *beis din*.

The Debtor's principals can choose to ignore the *ekul*, or injunction and not appear before the *beis din*, but that choice would involve substantial courage in light of the clear and imminent harm that would result to them if they did so. The *beis din* proceeding and the threat of the *sirov* have already affected not only their standing in the community but also their children, who have been harassed and threatened with expulsion from school. There is no question that those who invoked the *beis din* foresaw the consequences of their actions on the Debtor and this case and that they are engaging in considerable hypocrisy in arguing to the contrary.

The Debtor's principals have not yet bowed to this pressure, however; instead, the Debtor filed its Motion to enforce the automatic stay, requesting the imposition of sanctions comprising both actual and punitive damages as well as coercive sanctions to ensure future compliance with the stay.

## Jurisdiction

The Court has jurisdiction to decide the Motion, which arises under § 362 of the Bankruptcy Code as well as the Court's general contempt power and § 105(a) of the Bankruptcy Code (invoked in furtherance of § 362),[2] pursuant 28 U.S.C. §§ 157(a)-

---

[2] "The Court may issue any order, process or judgment that is

4

(b) and 1334(b).  This is a core proceeding under 28 U.S.C. §
157(b)(2)(A) that is central to the administration of the
Debtor's case and estate.

### Discussion

The Automatic Stay Applies.  The automatic stay under
11 U.S.C. § 362(a) is what it says: an automatic statutory
injunction that came into effect upon the commencement of this
chapter 11 case.  It embodies Congress's determination that
automatically staying all activity to the extent set forth in  §
362(a) - including, as most relevant here, "the commencement or
continuation, including the issuance or employment of process, of
a judicial, administrative, or other action or proceeding against
the debtor that was or could have been commenced before the
commencement of the case under this title, or to recover a claim
against the debtor that arose before the commencement of the case
under this title," 11 U.S.C. § 362(a)(1), and "any act to obtain
possession of property of the estate or property from the estate
or to exercise control over property of the estate," 11 U.S.C. §
362(a)(3) - is a fundamental protection not only of debtors in
bankruptcy cases, but also of debtors' estates and creditors.
See, e.g., 3 COLLIER ON BANKRUPTCY ¶ 362.03 (Alan N. Resnick & Henry
J. Sommer eds., 16th ed. 2015)(quoting H.R. Rep. No. 595, 95th

---

necessary to carry out the provisions of this title."  11 U.S.C.
§ 105(a).

Cong. 1st Sess. 340 (1977)).

Indeed, the automatic stay is the debtor's primary protection during a bankruptcy case, just as the discharge is the debtor's primary protection at the end of the case. As noted, it serves not only the debtor, but also the debtor's creditors in the collective context of the case by ensuring the orderly determination of the debtor's liabilities, realization on the estate's assets, and allocation of that value to creditors and interest holders according to the Bankruptcy Code's priority scheme and policy of equality of distribution. Id.; SEC v. Brennan, 230 F.3d 65, 70 (2d Cir. 2000); In re Parr Meadows Racing Ass'n, Inc., 880 F.2d 1540, 1545 (2d Cir. 1989). In an context where every dollar counts, the automatic stay prevents unilateral races to dismember the debtor and actions outside the bankruptcy court's supervision with their attendant diversion of resources and impairment of the debtor's value. Id.; In re Colonial Realty Co., 980 F.2d 125, 133 (2d Cir. 1992).

Bais Chinuch and the individuals who invoked the *beis din* responded to the Motion by contending, first, that they did not violate 11 U.S.C. § 362(a)(1) and (a)(3) because they sought *beis din* relief only against the Debtor's principals and not the Debtor. This, however, is incorrect as a matter of law. It is clear from the facts, which in all relevant ways are undisputed, that the issues to be determined by the *beis din* as set forth in

6

the two *hazmanas* pertain to the Debtor's principals' commencement and continued prosecution of the adversary proceeding.  Although the *beis din*'s *hazmanas* refer to "all" the claims between the parties, it was acknowledged during oral argument, and the Court finds, that those claims are not, in real terms, claims between those who invoked the *beis din* and the Debtor's principals, but, rather, claims between those who invoked the *beis din* and the Debtor.  In other words, it was only because the Debtor's principals directed the Debtor to act as it has in this chapter 11 case that the *beis din* proceeding was invoked against them.

It is equally obvious, therefore, that Bais Chinuch and the individuals' invocation of the *beis din* proceeding - and the issuance of the *beis din*'s *ekul*, or injunction - are actually directed at the Debtor through its principals with the intention of wresting control of the Debtor's adversary proceeding and exerting pressure to have it dismissed.

Under well-established case law, the fact that, nominally, these actions were against the Debtor's principals therefore is of no legal effect.  Because of the principals' identity of interest here with the Debtor, the automatic stay applies to protect them from the *beis din*.  See <u>Queenie, Ltd. v. Nygard Int'l</u>, 321 F.3d 282, 288 (2d Cir. 2003); <u>In re North Star Contracting Corp.</u>, 125 B.R. 368, 370-71 (S.D.N.Y. 1991); <u>In re Lomas Fin. Corp.</u>, 117 B.R. 64, 67-8 (S.D.N.Y. 1990); <u>In re Delphi</u>

Corp., Case Number 05-4481-rdd, modified bench ruling dated May
22, 2007 [Doc. 7995].[3]  If that were not the case, there would be
such a hole in the automatic stay that it would have no force.
Parties in interest in bankruptcy cases could walk right through
it simply by suing the debtor's principals for actions which they
took in that capacity.[4]

It is clear, moreover, that the purpose of commencing
the *beis din* proceeding and seeking *ekul* relief was to control
the adversary proceeding, an estate asset, in contravention of 11
U.S.C. § 362(a)(3).  See In re Sturman, No. 10-CIV-6725, 2011
U.S. Dist. LEXIS 109599, at *5-8 (S.D.N.Y. Sept. 27, 2011)
(parties who obtained a probate court injunction of the continued
conduct of the Chapter 7 case violated the automatic stay).

The first part of the Debtor's requested relief is

_____

[3] The case law cited by Bais Chinuch and the individual objectors
for the proposition that the automatic stay does not apply here
in fact recognizes the distinction between bringing a proceeding
against principals of the debtor based on their status or actions
in that capacity, which is effectively a proceeding against the
debtor and, thus, subject to the automatic stay, and, on the
other hand, actions against third parties who are principals of
the debtor based on separate conduct by those parties giving rise
to separate and independent claims.  See, e.g., DeSouza v.
PlusFunds Group Inc., 05-CIV-5990, 2006 U.S. Dist. LEXIS 53392,
at *7-8 (S.D.N.Y. Aug. 1, 2006).

[4] There is no need, therefore, for the Debtor to seek relief
under the standard required for a preliminary injunction to
protect its principals from the *beis din* proceeding (although the
Court would have the power to grant injunctive relief under
appropriate circumstances).  See In re Calpine Corp., 354 B.R.
45, 48-49 (Bankr. S.D.N.Y. 2006)).  The automatic stay suffices.

8

granted, therefore: an order declaring that the automatic stay applies to the commencement and continued prosecution of the *beis din* proceeding, that such activity violated and continues to violate the automatic stay under 11 U.S.C. § 362(a)(1) and (3), and that the issuance of the *ekul* and any future issuance of any ruling by the *beis din*, whether it be an *ekul* or a *sirov*, on these facts is void *ab initio*. See Picard v. Fairfield Greenwich Ltd., 762 F.3d 199, 207 (2d Cir. 2014) (as modified) ("So central is the § 362 stay to an orderly bankruptcy process that actions taken in violation of the stay are void and without effect.") (internal citations and quotation omitted); In re 48th St. Steakhouse, Inc., 835 F.2d 427, 431 (2d Cir. 1987), cert. denied, 485 U.S. 1035 (1988) ("actions taken in violation of the [automatic] stay are void and without effect") (internal citations omitted).

Damages and Coercive Sanctions.  The purpose of the initial hearing on the Motion did not include the determination of damages, including whether any punitive damages should be awarded, if a stay violation were found.  In light of the Court's conclusion that the stay was violated, however, at least actual damages will need to be calculated.  Under § 362(k) of the Bankruptcy Code, an individual injured by any willful violation of the automatic stay "shall" recover actual damages, including costs and attorney's fees, and, in appropriate circumstances,

9

"may" recover punitive damages.  11 U.S.C. § 362(k)(1)

The objectors' assertions that they did not think the automatic stay applied to them or that they acted in good faith, even if true, would not protect them from the imposition of actual damages.  Only knowledge of the existence of the automatic stay and a deliberate act in violation of it are required.  Thus, for actual damages to be imposed, "[s]uch an act need not be performed with the specific intent to violate the stay," In re Sucre, 226 B.R. 340, 346 (Bankr. S.D.N.Y 1998); "[r]ather, so long as the violator possessed 'general intent in taking such actions which have the effect of violating the automatic stay,' the intent requirement of § 362(h) [now § 362(k)] is satisfied." Id. (quoting In re Chateaugay Corp., 112 B.R. 526, 529 (S.D.N.Y. 1990), rev'd on other grounds, 920 F.2d 183 (2d Cir. 1990)); see also In re Sturman, 2011 U.S. Dist. LEXIS 109599, at *8-17 (discussing actual, as well as punitive, damages under 11 U.S.C. § 362(k)); In re Killmer, 513 B.R. 41, 50-51 (Bankr. S.D.N.Y. 2014); In re Bailey, No. 06-10884, 2007 Bankr. LEXIS 2394, at *12-16 (Bankr. S.D.N.Y. July 10, 2007) (discussing actual damages under 11 U.S.C. § 362(k)); In re Harris, 374 B.R. 611, 615-16 (Bankr. N.D. Ohio 2007) (same).

"This standard encourages would-be violators to obtain declaratory judgments before seeking to vindicate their interests in violation of an automatic stay, and thereby protects debtors'

estates from incurring potentially unnecessary legal expenses in prosecuting stay violations." In re Crysen/Montenay Energy Co., 902 F.2d 1098, 1105 (2d Cir. 1990).  That is, Congress intended in § 362 to prevent self-help, or shooting first and aiming later.

Moreover, in addition to its power under § 362(k) of the Bankruptcy Code, the Court has general contempt power over violations of the automatic stay, In re Chateaugay Corp., 920 F.2d at 187 (as well as power under § 105(a) of the Bankruptcy Code), including the power to impose coercive sanctions to prevent such violations from continuing.  See In re Ionosphere Clubs, Inc., 171 B.R. 18, 21 (S.D.N.Y. 1994).[5]

Accordingly, as set forth at the end of this Memorandum of Decision, the Court will impose coercive sanctions to ensure

---

[5] The Debtor's principals are individuals covered by 11 U.S.C. § 362(k).  Where violation of the automatic stay injures corporate or other juridical persons, damages are awarded under the Court's general contempt power, In re Chateaugay Corp., 920 F.2d at 187, or under 11 U.S.C. §105(a), although, "when it comes to violations of the automatic stay and sanctions therefor, the necessary level of willfulness is not particularly high." In re A.C.E. Elevator Co., Inc., No. 04-17994, 2009 Bankr. LEXIS 3089, at *17 (Bankr. S.D.N.Y. Oct. 7, 2009).  See Fidelity Mortg. Investors v. Camelia Builders, Inc., 550 F.2d 47, 51, 57 (2d Cir. 1976) (allowing the imposition of costs, including reasonable attorney's fees, under civil contempt power for acts with "knowledge" of automatic stay and "deliberate[]" disregard of bankruptcy rules regarding requirements for relief), cert. denied, 429 U.S. 1093 (1977); In re Ionosphere Clubs, 171 B.R. at 21 (no more required to justify a contempt finding against one disobeying the automatic stay than actual notice of the stay).

future compliance with the automatic stay and direct the parties

to schedule a hearing on issues pertaining to any remaining

requests for sanctions in the form of actual and punitive

damages.

Enforcement of the Automatic Stay Does Not Violate the

Free Exercise or Establishment Clauses. Before setting the

amount of coercive sanctions, however, the Court must address a

second defense to the Motion: that the "church autonomy

doctrine," based on either the Free Exercise or Establishment

clauses of the First Amendment to the Constitution, although more

aptly the Free Exercise clause, U.S. Const. Amend. 1, cl. 1,

protects Bais Chinuch and the individual targets of the Motion

from the consequences of any violation of the automatic stay in

light of the religious nature of the *beis din* proceeding.

I should note at the outset that the Court clearly has

the power to adjudicate the claims asserted by the Debtor in its

adversary proceeding against those who invoked the *beis din*. The

Debtor's adversary proceeding claiming fraud, breach of fiduciary

duty and looting involves no issues of religious doctrine, nor is

it an interchurch dispute. See Hosanna-Tabor Evangelical

Lutheran Church & Sch. v. EEOC, 132 S. Ct. 694, 707 (2012)

(applying "ministerial exception" under the Free Exercise clause

to court's jurisdiction if challenged law does not regulate

"outward physical acts," and, "in contrast, concerns government

12

interference with an internal church decision that affects the faith and mission of the church itself"); Listecki v. Official Comm. Of Unsecured Creditors, 780 F.3d 731, 742 (7th Cir. 2015), pet. for cert., July 8, 2015 (discussing narrow "ministerial exception" under the Free Exercise clause to secular court's power to decide disputes of a purely religious nature).

Based on the context in which the *beis din* was invoked – an attempt to forestall the Debtor's adversary proceeding – it is also hard to see how the enforcement of the automatic stay here has any religious nature, either. Nevertheless, it is conceivable that seeking to enforce the automatic stay in a secular court against the pursuit of any claims in a religious court might violate the free exercise of religion. Thus, I will consider whether the Motion's request to enforce of the automatic stay is unconstitutional in light of the objectors' rights under the Free Exercise and Establishment clauses.

Those rights are severely limited by Supreme Court precedent going back at least to Employment Division, Department of Human Resources of Oregon v. Smith, 494 U.S. 872, 878-79, 110 S. Ct. 1595, 108 L. Ed. 2d 876 (1990), which was cited last year in Burwell v. Hobby Lobby Stores, Inc., 134 S. Ct. 2751, 189 L. Ed. 2d 675 (2014), as having rejected the Court's "balancing" test set forth in Sherbert v. Verner, 374 U.S. 398, 83 S. Ct. 1790, 10 L. Ed. 2d 965 (1963), by holding that, "under the First

Amendment, neutral, generally applicable laws may be applied to religious practices even when not supported by a compelling governmental interest." 134 S. Ct. at 2761 (internal quotations and citations omitted).[6] See also Listecki v. Official Comm. of

---

[6] The issue in Hobby Lobby was not the constitutionally protected free exercise of religion, but, rather, whether the government's imposition of a federal regulation violated the Religious Freedom Restoration Act (the "RFRA"), which applies a more restrictive limitation on governmental actions affecting religion than the constitutional law principles established in Smith. 42 U.S.C. §2000bb-1(a) and (b). The RFRA requires a compelling governmental interest in the exercise of the government's power and, if such action substantially burdens the exercise of religion, that it be the least restrictive means of serving such interest. Id. See also Hobby Lobby, 134 S. Ct. at 2767.

The RFRA is irrelevant here, however, because it does not apply to private actions between private parties, such as the Debtor's Motion, but only to acts by the government and, perhaps, to acts by private parties where the government could also exert its power. Listecki v. Official Comm. of Unsecured Creditors, 780 F.3d at 736-40; General Conf. Corp. of Seventh-Day Adventists v. McGill, 617 F.3d 402, 411-12 (6th Cir. 2010), cert. denied, 131 S. Ct. 2097 (2011); Sutton v. Providence St. Joseph Med. Ctr., 192 F.3d 826, 834, 837-43 (9th Cir. 1999). See also Rweyemamu v. Cote, 520 F.3d 198, 203 n.2 (2d Cir. 2008) (stating in strong dicta that the RFRA does not apply to suits between private parties); cf. Hankins v. Lyght, 441 F.3d 96, 103 (2d Cir. 2006) (RFRA applies to suits between private parties if the federal government also could enforce the statute at issue).

In any event, the governmental interest in the automatic stay is compelling (as discussed above, it is the fundamental protection of debtors and their estates during the bankruptcy case). Indeed, it is integral to a constitutional interest, set forth in Const. Art. 1, § 8, cl. 4, that Congress shall have the power to enact uniform laws on bankruptcy, which was a significant influence on the founders' decision to create a more powerful federal government that would prevent the individual states' repudiation of debts occurring under the Articles of Confederation. THE FEDERALIST NO. 42 (James Madison); see also BRUCE

Unsecured Creditors, 780 F.3d at 742-42, quoting Hobby Lobby, 134

S. Ct. at 2761, and applying Smith to uphold application of the

Bankruptcy Code's transfer avoidance provisions over an

archdiocese's argument that to do so unduly restricted the free

exercise of religion.

Under Smith, the Court's focus is, first, and properly

only, on whether, in addition to being facially neutral, the law

sought to be enforced is general and neutral in its application -

that it is not in practice aimed or used to promote or restrict

religious belief.  Employment Div., Department of Human Resources

of Oregon v. Smith, 494 U.S. at 881-83. See also Listecki v.

Offficial Comm. of Unsecured Creditors, 780 F.3d at 743-45; Cent.

Rabbinical Cong. of United States & Canada v. New York City Dep't

of Health & Mental Hygiene, 763 F.3d 183, 193 (2d Cir. 2014) (a

---

H. MANN, REPUBLIC OF DEBTORS: BANKRUPTCY IN THE AGE OF AMERICAN INDEPENDENCE,
185-86 (Harv. Univ. Press 2002).  The automatic stay's
enforcement here does not substantially burden the objectors'
free exercise of religion, moreover, when they have invoked a
rabbinical court to decide (and interfere with) an essentially
commercial dispute.  See Tony & Susan Alamo Found. v. Sec'y of
Labor, 471 U.S. 290, 303-05, 105 S. Ct. 1953, 84 L. Ed. 2d 278
(1985); U.S. v. Lee, 455 U.S. 252, 258-60, 102 S. Ct. 1051, 71 L.
Ed. 2d 127 (1982); Braunfeld v. Brown, 366 U.S. 599, 606-07, 81
S. Ct. 1144, 6 L. Ed. 2d 563 (1961); In re Kahn, No. 10-46901,
2014 Bankr. LEXIS 4205, at *137-39 (Bankr. E.D.N.Y. Sept. 30,
2014); In re Beachy, No. 10-62857, 2011 Bankr. LEXIS 2718, at
*20-23 (Bankr. N.D. Ohio Mar. 18, 2011).  Finally, as discussed
below, the automatic stay could not be more narrowly tailored
without making a specific exemption for religious courts (which
Congress has not done) and still serve the interests of
preservation of value, efficiency and equality of distribution.

law may burden religious conduct under the First Amendment

without strict scrutiny if it is both neutral and generally

applicable); Universal Church v. Geltzer, 463 F.3d 218 (2d Cir.

2006), cert. denied, 549 U.S. 1113 (2007), which found a

bankruptcy trustee's fraudulent transfer action against a church

did not violate the Free Exercise and Establishment clauses of

the First Amendment:

> It is well established that a generally applicable law
> that does not target religious practices does not
> violate the Free Exercise Clause. . . . [T]he
> [transfer] avoidance principal [of the Bankruptcy Code]
> is generally applicable and religion-neutral.  Thus it
> does not violate the Free Exercise Clause, regardless
> of the burden it may place on the religious practices
> of those who [tithe above the Bankruptcy Code's safe
> harbor].
>
> For a statute to be permissible under the Establishment
> Clause, it must have a secular purpose; it must neither
> advance nor inhibit religion in its principal or
> primary effect; and it must not foster an excessive
> entanglement with religion. . . . Because prior cases
> have made clear that entanglement is merely an aspect
> of the statute's effect, [transfer] avoidance also does
> not create an excessive entanglement with religion by
> requiring religious institutions to return funds
> previously received.

Id. at 227-28 (internal quotations and citations omitted).

      The automatic stay is clearly neutral on its face and

is also neutral and generally applicable, as far as religious

exercise is concerned, in practice.  It applies to anyone who

falls within the ambit of 11 U.S.C. § 362(a) (here, to anyone who

commences a proceeding or takes another action covered by either

11 U.S.C. § 362(a)(1) or (3)).  It prohibits the invocation of
all covered proceedings, whether in state or federal court, a
foreign court, or a *beis din*.  To the extent relevant, the
clearly secular interests that the automatic stay protects – to
prohibit self-help and funnel all of the activity covered by the
stay through the bankruptcy court from the instant that the
bankruptcy case commences until, after motion on proper notice,
the court lifts the automatic stay in light of neutral interests
that Congress believed warrant such relief – are not directed at
religious observance or excessively entangled with religion.
Indeed, the automatic stay could not be more narrowly tailored in
light of religious observance, because its function is to apply
to everyone, with certain neutral exceptions, requiring a motion
under 11 U.S.C. § 362(d) for relief from the stay where the stay
is even remotely applicable, let alone under the facts here,
before one can be assured that the stay will not be violated.[7]
In re Crysen/Montenay Energo Co., 902 F.2d at 1105.

        The enforcement of the automatic stay here, therefore,
does not violate the Free Exercise or Establishment clauses of

---

[7] There has been no contention, moreover, that the enforcement of
the automatic stay here involves not only the Free Exercise
clause but also another constitutionally protected right, such as
freedom of the press, nor could there be.  See Employment Div. of
Human Resources of Oregon v. Smith, 494 U.S. at 881 (noting
"hybrid" exception to its holding that neutral, generally
applicable laws do not breach the Free Exercise clause).

the First Amendment.   See generally Listecki, 780 F.3d at 744-50.
See also Universal Church v. Geltzer, 463 F.3d at 227-28; In re
Scroggins, 209 B.R. 727, 730-31 (Bankr. D. Ariz. 1997) (enforcing
the automatic stay under 11 U.S.C. § 362(a) violates neither the
Establishment clause nor the more restrictive test of the RFRA).

It should be noted that the foregoing rationale also
has permitted enforcement of the automatic stay and the
bankruptcy discharge notwithstanding the First Amendment's
protection of free speech, provided the speech at issue was
coercive.   See In re Andrus, 184 B.R. 311, 315 (Bankr. N.D. Ill.
1995), aff'd, 189 B.R. 413, 416 (N.D. Ill. 1995); In re Sechuan
City, Inc., 96 B.R. 37, 43 (Bankr. E.D. Pa. 1989), and the cases
cited therein.   See also In re Baumblit, 15 Fed. App'x 30, 36-37
(2d Cir. 2001) ("It is well settled that First Amendment rights
are not immunized from regulation when they are used as an
integral part of conduct which violates a valid statute."); In re
Collier, 410 B.R. 464, 474-76 (Bankr. E.D. Tex. 2009) (same, as
applied to sign that sought to compel debt payment and therefore
violated the automatic stay).

The sole contrary authority in a bankruptcy context
cited by the objectors, Michael A. Helfand, Fighting for the
Debtor's Soul: Regulating Religious Commercial Conduct, 19 Geo.
Mason L. Rev. 157 (2011), is not persuasive.   Professor Helfand
cites positively the foregoing First Amendment Free Speech clause

case law,[8] and states that the invocation of a religious tribunal

such as a *beis din* to collect a debt would be a sanctionable

violation of the automatic stay notwithstanding the Free

Exercise clause if simply motivated by an individual's religious

interests.  Id. at 189-90.  Nevertheless, without citing any

post-Smith cases in support, he suggests that the Free Exercise

clause might require a different result if the same action were

taken in "a religious community [that] conceive[d] of aggrieved

plaintiffs as private attorneys general – each obligated or

encouraged to file suit in order to protect and promote religious

communal values."  Id. at 190.  Not only does this proposition

ignore Smith and its progeny, it also would create an unworkable

test based on the Court's assessment of "communal" rather than

"individual," or individualistic, religious intent.  Moreover,

it overlooks that the automatic stay protects the debtor's

estate and other creditors, too, who, except for the rare

bankruptcy case, are not all subject to the same religious

strictures and institutions, including the customary resolution

---

[8] Id. at 175 ("[T]he protections captured in the First
Amendment's Free Speech clause have done little to limit the
application of the automatic stay.  To the extent that parties
have used free speech protections to shield themselves from
liability for violating the automatic stay, courts have recast
their speech as conduct . . . [that] can legitimately be
prohibited by the automatic stay.  Indeed, the fact that free
speech claims have generally not been successful when deployed
against the automatic stay encapsulates the importance of the
automatic stay in the bankruptcy scheme.").

of disputes by a religious court.[9]  See Jonathan C. Lipson, On
Balance: Religious Liberty and Third Party Harms, 84 Minn. L.
Rev. 589, 615-16 (2000) (noting how under the pre-Smith
balancing doctrine, "the [Supreme] Court has not deferred deeply
to claims that conduct is a religious exercise where third
parties would be harmed.  Rather, the continuum of deference
suggests that deference declines, and judicial scrutiny
increases, in proportion to the likelihood of third-party
harm.").

Accordingly, the second basis for the objections to the
Motion is also overruled.

## Conclusion

As discussed above, the issue of the amount of damages
and whether any punitive damages are warranted will be determined
at a later hearing.  The issue of future compliance should be
addressed immediately, however.  Here, the objectors' continued
pursuit of the *beis din* proceeding despite warnings from Debtor's
counsel, as well as the tenor of some of their arguments at the
hearing, raised a serious concern that the objectors would not
withdraw their request of the *beis din* and that the *beis din*
would proceed to enforce its *ekul* and issue a *sirov*
notwithstanding the Court's ruling.  Thus coercive sanctions to

---

[9] For example, one of the Debtor's major creditors is TD Bank,
N.A.

ensure compliance with the statute were warranted.  In re
Ionosphere Clubs, 171 B.R. at 21.

A court should consider the issuance of an anti-suit
injunction of another tribunal "only with care and great
restraint," China Trade & Dev. Corp. v. M.V. Choong Yong, 837
F.2d 33, 36 (2d Cir. 1987), although it should also act "in order
to protect its own jurisdiction," id. at 37; In re Petition of
Bd. of Directors of Hopewell Int'l. Ins., 272 B.R. 396, 405, 409-
10 (Bankr. S.D.N.Y. 2002). See also Computer Assocs. Int'l., Inc.
v. Altai, Inc., 126 F.3d 365, 372 (2d Cir. 1997), cert. denied
523 U.S. 1106 (1998).  Thus, although the *beis din* improperly
issued its own anti-suit injunction here, I chose not to impose
coercive sanctions in the first instance on the *beis din* itself,
noting, however, that, just as the *beis din's* actions to date
have been void *ab initio*, any rulings going forward in the *beis
din* proceeding would be, too.

I have, though, imposed coercive sanctions on Bais
Chinuch and each of the individuals named in the Motion, at the
hearing giving them until the close of business on the following
day to request the *beis din* to cease its proceeding and to vacate
the *ekul*.  The coercive sanction for each one of them was $10,000
a day until they make that request.  It was a several obligation
because it would take only one party to disobey my order for this
improper process to continue.

21

Although it is extraneous to my ruling, I am of course mindful of the importance of religion in the community in which the Debtor largely - though, as noted, far from exclusively - operates.  This ruling should not be read to exclude religious doctrine and processes from a role in this case.  However, they may not be invoked in a unilateral and coercive way to evade the consequences of conduct that neutral laws sanction.

Dated:  White Plains, New York
        August 24, 2015

                        /s/Robert D. Drain
                        United States Bankruptcy Judge